# UNITED STATES DISTRICT COURT

# NORTHERN DIVISION OF OHIO

# EASTERN DIVISION

FILED
JAN 17 2020
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF OHIO
CLEVELAND

| | | |
|---|---|---|
| Adam Evans | ) | Case # 19 CV-2870 |
| Plaintiff | ) | |
| | ) | U.S. JUDGE; GWIN |
| v. | ) | U.S. MAGISTRATE; PARKER |
| | ) | |
| Annette Chambers-Smith, et al | ) | ADMISSION OF RELEVANT EVIDENCE #2 |
| Defendants | ) | (Federal Civil Rules; 401, 402, 406) |

Now come the Plaintiff, Adam Evans (in propria persona;) as an indigent prisoner (self-represented) and pursuant to Federal Civil Rules; 401, 402, 406 does hereby submit and admit to the record, the attached, sworn to certified relevant evidence and witness/victims sworn affidavits that support and prove all of his claims in the complaint.

Submitted on this date:

_JANUARY 15, 2020_

Submitted by:

S/ _Adam Ev_

Adam Evans, Plaintiff

## Service

A copy of This Filing W/Attached admitted evidentiary materials WAS SENT TO DEFENDANTS COUNSEL at;- THE OHIO ATTORNEY GENERAL, 150 E. GAY ST. COLUMBUS, OHIO 43215 AND DIRECT TO THE OHIO GOVERNOR (MICHAEL DEWINE) AND TO THE D.R.C. DIRECTOR (ANETTE CHAMBERS SMITH)

| **State of Ohio** | ) | **Affidavit of Adam Evans** |
| **Richland County** | ) | |

I, the Affiant, Adam Evans, being duly sworn (in compos mentes) do hereby depose;

1) My name is Adam Evans, the named Plaintiff in the U.S. District Court in the pending case of Adams Evans v Annette Chambers-smith et al, case number 19- CV-2870.

2) My date of birth is October 11, 1974. The last 4 digits of my social security number are 6690. My inmate identification number is A761655.

3) I hereby certify that all materials and documents attached herewith are valid copies as relevant evidence that prove and support my claims and charges in my lawsuit.

Wherefore by affixing my signature hereto, I certify that all my statements are true under caution of the penalties for perjury.

The Affiant further sayeth naught.

Sworn to by:

S/ _Adam Evans_

Adam Evans

## NOTARY PUBLIC

Sworn to and subscribed in my presence, a Notary Public for the State of Ohio, Richland County on this

10 day of January , 20__

S/ _Monica DeJulius_

Notary Public

*(Notary Seal: MONICA DEJULIUS, NOTARY PUBLIC, STATE OF OHIO)*

exp 2-26-22

**ER**

TO**ALL FOR ADC 440

ılin      C045

3

'TY JAIL

# DeWine's focus is on a jail in 'crisis'

## Unprecedented scrutiny will continue until fixed

Adam Ferrise *aferrise@cleveland.com*

Ohio Gov. Mike DeWine's administration found such extensive problems at the Cuyahoga County Jail that he ordered unprecedented changes to the way the state oversees jails. He dubbed the problems at the jail a "crisis."

DeWine, in a review of how the state oversees local jails, used the Cuyahoga

# Jail

FROM A1

was passed that allowed the ODRC director to file a lawsuit in common pleas court that would force court-enforced compliance with minimum jail standards. Thus far, no county, city or government in Ohio has been the subject of such a lawsuit.

## POSSIBLE LAWSUIT FOR CUYAHOGA COUNTY

The state even declined to intervene in Franklin County where the U.S. Department of Justice in 2010 filed suit when it was revealed that jail guards at the Franklin County Jail used excessive force against inmates.

DeWine said on Thursday he would not rule out using a lawsuit to force Cuyahoga County to comply with jail standards if the county fails to remedy issues that continue to plague its jail.

The ODRC's report also says the state can bring a lawsuit against a county for failing to provide documentation on critical incidents, such as deaths and excessive uses of force by jail officers, an issue state inspectors had in Cuyahoga County.

ODRC Director Annette Chambers-Smith said in an interview with cleveland.com on Friday that she sees no need to file a lawsuit against the county as things stand now.

New Cuyahoga County Jail Director Ronda Gibson, whose first day on the job was Monday, impressed jail inspectors, Chambers-Smith said. She said Gibson's prior experience should help the jail and pointed out that the former jail director, Ken Mills, had no prior experience in corrections.

## OTHER SPECIFICS TO CUYAHOGA COUNTY JAIL

The state has never before put the type

Mansfield ••••••••••••••••••
Richland Correctional Library
1001 Olivesburg Rd
Mansfield OH 44905-122?
 իլիլիակիիիիկիակիիակ

**CUYAHOGA**

# County never investigated now-indicted jail warden

**Adam Ferrise** *aferrise@cleveland.com*

Cuyahoga County officials never conducted an internal investigation into now-indicted ex-jail warden Eric Ivey for accusations contained in a U.S. Marshals Service report that singled out Ivey for ordering food withheld from inmates and failing to oversee a team of officers that attacked and threatened inmates.

Sheriff Cliff Pinkney in a Feb. 6 meeting with reporters and editors with cleveland.com said the county human resources department would investigate Ivey for the issues contained in the Nov. 21 U.S. Marshals report.

Cuyahoga County spokeswoman Mary Louise Madigan, after repeated questions from cleveland.com over the status of the investigation, said Friday that the human resources department never initiated any such investigation. She did not know why no one started an investigation into Ivey.

Pinkney, whose last day as sheriff is Friday, could not be reached for comment. Cuyahoga County Council issued its first-ever subpoena to Pinkney, which forced him to appear before the council at a meeting this afternoon.

Pinkney during his testimony said the Sheriff's Office never conducted an internal investigation into Ivey. He said he asked the county's human resources department to investigate, but that he never heard back from anyone in that department.

**SEE JAIL WARDEN, A8**

---





largest-ever thefts of bank data, a soft-
sonal data of over 100 million people.

**ENVIRONMENT**

# New hybrid warbler species raises ecology

hink passwords

**Other steps to protect yourself**

> Be on guard for emails or phone calls that seem to come from Capital One or law enforcement, and request personal information. "Don't be surprised if you see an uptick in unsolicited calls and emails

# Jail inspection

FROM A1

As governor, DeWine has the authority to make broad policy changes within the Ohio Department of Rehabilitation and Corrections' inspection process.

Many of the changes have statewide implications, but DeWine said he's focused on Cuyahoga County. His inspectors will conduct an inspection of the jail every 30 days, instead of once every year.

"If they need to inspect it more often, they will," DeWine said. "If they need to live there, they'll live there."

DeWine ordered the review of the state's jail inspections after the U.S. Marshals Service found "inhumane" conditions and civil rights violations in a November inspection, despite the state routinely finding little wrong at the jail.

An ensuing state inspection found the county out of compliance with 84 minimum state jail standards, mostly using information from the U.S. Marshals report.

An inspection Monday found the county jail still out of compliance with 66 minimum standards, including medical and mental healthcare of inmates, food service, inmate discipline and unsanitary conditions.

DeWine in March ordered the review of the state's jail inspections statewide. The report on the state's inspections process, in part, uses Cuyahoga County Jail as a case study.

That report blames Cuyahoga County's attempts to bring the county's local jails under its control. Cuyahoga County Executive Armond Budish's administration sought to contract with communities in the Cleveland area to house inmates as a way for the county to generate revenue. That plan came at the same time as populations within the aging facility saw pregnant women sleeping on floors and inmates crammed in crowded pods for up to 23 hours a day.

Cleveland's city jail closed in June 2018, flooding the county jail with new inmates. The understaffed jail was not prepared to handle the additional population, the report says.

County jail officials, who were not named in the report, declined the ODRC's offer for assistance in helping with that transition prior to June 2018, the report says. The same officials declined an offer by the ODRC to inspect the jail after several inmate deaths, which began the same month Cleveland began housing its inmates in the county jail.

The report also says that the county was "not prepared" for their 2018 jail inspection and refused to provide required documentation to jail inspectors.

Jail officials were "obstinate" when state inspectors asked for documentation of the deaths and incidents of excessive uses of force by corrections officers, among other documents, the report says.

"Documented efforts on the part of the jail inspectors were met with significant resistance or non-compliance...," the report says.

DeWine ordered the following changes to the way the state inspects its jails:

> The state will hire eight jail inspectors and a nurse to add to their current roster of just six inspectors. The six-person staff oversaw previous inspections of more than 300 jails and holding cells. The nurse was added to the staff because many jail-related issues stem from some sort of medical or mental illness, DeWine said. DeWine said the jail inspection unit was "grossly understaffed."

> Those jail inspectors will review every jail or holding cell to see if they comply with all jail standards. Inspectors looked previously at the most critical standards every year and about half of the other jail standards on a rotating basis.

> The ODRC will now send copies of its annual inspections not only to a sheriff or police chief who oversees a jail, but to that city's and county's administrative municipal and common pleas judges and the county prosecutor. They will also get sent to local government entities, such as city councils or county commissioners. DeWine said that decision is meant to provide more transparency and information to others who could potentially try to address problems at local jails.

DeWine will ask the Ohio Supreme Court to work with the ODRC to develop a uniform way for county grand juries to report what they find during their required jail inspections. Grand juries in every county are required to take a tour of the jail and issue a written report.

DeWine also said he will ask the Ohio legislature to approve two changes:

> Allowing the ODRC to conduct unannounced inspections at local jails. All jail inspections currently are conducted with advance notice.

Require local jails to report all critical incidents — such as inmate deaths, officers using excessive force against inmates and inmate violence — to ODRC so the state can track serious incidents.

The announcement was met with praise by two area state legislators — state Sen. Nicki Antonio, D-Lakewood, and state Rep. Jeff Crossman, D-Parma.

Both said in a joint statement that they've discussed their concerns with the county jail with DeWine and plan to review the changes he's proposing.

"We will be taking a hard look at the governor's proposed changes to see if they adequately address the growing concerns we have about the conditions in the Cuyahoga County Jail and the state's role in facility oversight over the past year," Crossman said. "Every person detained must be treated fairly and humanely and employees should have the necessary resources to perform their duties to the best of their abilities."

## UNSWORN DECLARATION UNDER PENALTY OF PERJURY

I, **Sgt. Philip Christopher**, hereby make the following declaration under 28 U.S.C. § 1746:

1. I am the Jail Investigations Coordinator in the Cuyahoga County Jail ("the jail").

2. I have personal knowledge concerning the facts in this declaration.

3. I have more than 18 years of experience with the Sheriff's Department and have been the Jail's Investigations Coordinator since 2009.

4. As the Jail Investigations Coordinator, I am often asked to review policies and procedures within the jail and investigate whether criminal offenses have occurred.

5. If a corrections officer intentionally beat an inmate that would warrant an investigation.

6. I have no records indicating Darryl W. Smith was ever beaten by a corrections officer.

7. All jail reports concerning Darryl W. Smith are attached.

8. The jail receives annual inspections by the Ohio Dept. of Corrections.

9. Most recently, the jail received a favorable inspection.

10. I have personal knowledge of the Jail's procedures for creating and maintaining the records attached hereto.

11. Such business records are: (a) made at or near the time of the occurrence of the matters set forth therein by persons with personal knowledge of the information in the business record, or from information transmitted by persons with personal knowledge; and (b) kept in the course of this Office's regularly conducted business activities. It is the regular practice of the jail to keep such records. I have personal knowledge of the Jail's procedures for the safekeeping and retrieval of its records.

12. Darryl W. Smith is presently housed in the jail as of approximately July 3, 2018.

13. I declare under penalty of perjury that the foregoing is true and correct.

24. Executed on July 19, 2018.

_Sgt. Php Clth_
Sgt. Philip Christopher

# Judge releases burglar

By CHRISTOPHER BOBBY
Tribune Chronicle

WARREN – A 19-year-old Warren man was released from prison Thursday after a judge expressed concerns for his well-being and a doctor's testimony on poor medical treatment in Ohio prisons.

Joshua Johnson originally was sentenced by Common Pleas Judge W. Wyatt McKay to serve three years in prison after convictions in a series of burglaries in the Trumbull County area. Prosecutors say he was linked to 12 burglaries.

McKay decided to release Johnson from prison and have him serve five years of intensive supervised probation at the county level.

Johnson began serving his three-year prison term in September.

About that time he was diagnosed with chronic renal failure – a condition that requires periodic dialysis. McKay learned at a hearing that the procedure was often overlooked in the lockup at Orient Correctional Institution. The same procedure has cost Trumbull County more than $5,000 on three different occasions over the last week while Johnson was awaiting the hearing before McKay.

Johnson's attorney, Maridee Costanzo, produced expert testimony from local physician Dr. Ronald Khoury, who explained that at one time he worked at a state prison.

The doctor said one reason he quit being a prison physician was because of the lack of attention some guards and prison officials gave to injuries and illness among inmates.

"I sentenced you to three years in prison. It wasn't my purpose to have you die in prison," McKay said.

While being monitored by probation officers, Johnson can continue the dialysis without cost to the state or the county since the defendant, his family, or his health insurance would cover the cost.

McKay warned Johnson that he must remain drug free while on probation. Johnson also was ordered to pay restitution sought by his burglary victims, one of them Lordstown Mayor Arno A. Hill.

McKay placed other conditions on the release, including no contact orders on other victims and ordering Johnson to seek his GED or employment while on probation.

**CUYAHOGA COUNTY JAIL**

# County to pay $140K to settle inmate lawsuit

**Eric Heisig** *eheisig@cleveland.com*

Cuyahoga County has agreed to pay $140,000 to a man who said corrections officers beat him for no reason and later intimidated him for speaking with the U.S. Marshals Service during its investigation into problems within the jail.

Corrionne Lawrence, 25, and his lawyers reached the settlement Thursday during negotiations facilitated by U.S. District Judge James Gwin, Lawrence's attorney Ashlie Sletvold said.

The settlement is subject to County Council approval.

Thursday's settlement was reached in the wake of problems within the jail made public in November 2018 in a marshals' report that highlighted systemic issues with the treatment of inmates.

County officials denied the allegations in the lawsuit. However, the jail has been under increased scrutiny in recent years, following a string of deaths and incidents where inmates said guards used excessive force.

The jail is the subject of an FBI civil rights investigation and an Ohio Attorney General's Office criminal probe that has yielded 11 indictments, four convictions and an acquittal. State inspectors noted in a report this month that conditions in the jail have improved greatly since last year.

**SEE SETTLEMENT, A15**

## Settlement

**FROM A1**

"Mr. Lawrence is pleased that the county is taking steps toward resolving the incidents against him in a way that befits their seriousness," Sletvold said in a news release. "He hopes that this resolution is the first step in resolving the County jail's ongoing human-rights crisis."

Eliza Wing, a spokeswoman for County Executive Armond Budish, said she could no comment because the council had not yet approved the settlement.

Lawrence, 25, is now at a prison in Mansfield, serving a three-year sentence for weapons and other charges. He named Cpl. Christopher Little, officers Brandon Smith, Barry Hickerson and Beverly Witt, and the county itself as defendants in the lawsuit. He accused the county of failing to oversee the jail, and the officers of physically and psychologically abusing Lawrence.

His lawsuit said jail staff placed him in a restraint chair for hours to punish him for speaking Spanish. It also said corrections officers placed him in a pod with an inmate charged with killing Lawrence's cousin, and allowed the fellow inmate to attack him.

Members of the jail's Special Response Team, known as the "Men in Black" also beat Lawrence bloody in an elevator, and he endured several threats before and after speaking with the marshals according to the lawsuit. In one instance, a corrections officer threatened to kill him and make it look like a suicide, Lawrence said.

FRIDAY
DECEMBER 13, 2019

THE STRICT "NO SNITCHING" POLICY ENFORCED AS JAIL GUARDS SAVAGELY BEAT DETAINEE FOR TALKING TO U.S. MARSHALS ABOUT CORRUPT JAIL CONDITIONS MINUTES AFTER TALKING! CORRUPT COUNTY JUDGE LIKEWISE PUNISHED HIM BY PROMPTLY SENDING HIM TO PRISON FOR 3 YEARS "FOR SNITCHING" ON JAIL!

# Cleveland defense lawyer who called witness a 'snitch' withdraws

**Cory Shaffer**  *cshaffer@cleveland.com*

Defense lawyer Roger Synenberg, who this week admitted to sending a letter calling a witness against his client in the Cuyahoga County corruption investigation a "snitch," has formally withdrawn from the case.

Synenberg represented indicted former county IT general counsel Emily McNeeley. He filed a motion late Friday notifying the court that he removed himself from the case.

McNeeley must now hire a new lawyer to represent her.

The move came after Synenberg on Wednesday admitted to investigators that he sent a printed out copy of a cleveland.com story with handwritten messages calling the county's internal auditor Cory Swaisgood a "snitch."

The letter was mailed to the city manager of Huron, with whom Swaisgood was in talks to become the Director of Finance.

"Please hire this snitch," the handwriting said. "You're next."

The letter is now the subject of a criminal investigation overseen by Erie County Prosecutor Kevin Baxter's office, and experts told cleveland.com the incident could spur legal disciplinary boards to launch an ethics investigation that could ultimately lead to Synenberg being sanctioned.

Swaisgood, who was awarded the Huron job and is set to begin Monday, is credited with flagging inconsistencies in the county's IT department that ultimately led to McNeeley's January indictment on 17 corruption-related counts.

Ohio Attorney General Dave Yost's office took over the corruption investigation in February when Cuyahoga County Prosecutor Michael O'Malley recused himself for potential conflicts of interest.

Prosecutors working for Yost's office publicly disclosed the letter on Tuesday as an exhibit to a motion accusing Synenberg of launching an effort to "harass the witnesses who could testify against [McNeeley]" by issuing several subpoenas seeking personal email and internet browsing records of several witnesses, including Swaisgood.

The filing also pointed to Synenebrg's comments at an April pretrial hearing in the case in which he accused Swaisgood of working as a confidential informant for prosecutors.

The letter writer, special prosecutor Matthew Meyer wrote in the filing, believed a "no snitching" culture should apply to



Attorney Roger Synenberg, in the striped tie, withdrew from representing former Cuyahoga County IT administrator Emily McNeeley, left, in glasses, after Synenberg admitted to sending a letter that called a key witness against McNeeley a "snitch." *David Petkiewicz, cleveland.com*

county government.

"Witnesses are being targeted," Meyer wrote.

"The Defendant cannot be permitted to use the instant subpoenas to further a campaign of witness harassment or fan the flames of a 'no snitching' culture in Cuyahoga County government."

Synenberg told cleveland.com on Wednesday that McNeeley had nothing to do with the letter.

"It was impulsive and regrettable," Synenberg told cleveland.com Wednesday.

"I am truly sorry and I wish to apologize."

Synenberg also on Friday filed a motion asking visiting Judge Patricia Cosgrove to give he and McNeeley more time to respond to motions filed by prosecutors on the case and Budget Director Maggie Keenan to quash the subpoenas that Synenberg fired off.

"Due to several issues that have arisen this week with respect to this matter, Ms. McNeeley and her counsel require additional time to determine how these motions will be addressed," Synenberg wrote in the earlier Friday motion.

The next pretrial scheduled in the case is set for June 25.

EXHIBIT —

INVESTIGATION

# Prosecutors investigating security video

Cory Shaffer cshaffer@cleveland.com

Special prosecutors conducting the corruption probe of county government are looking into Cuyahoga County Executive Armond Budish's administration's Dec. 11 firing of its budget director.

A pair of court filings on Thursday indicate that the Dec. 11 axing of Office of Budget and Management Director Maggie Keenan has become part of the case of human resources chief Douglas Dykes, who has remained on the job since he was charged in January with theft in office, tampering with records, obstructing official business and falsification.

Prosecutors working for Ohio Attorney General Dave Yost's office filed notice with the court after a Thursday morning telephone conference with Dykes' attorney, Anthony Jordan, that added Keenan and Budish's Chief of Staff Bill Mason to the list of potential witnesses the state intends to call to testify if Dykes go to trial.

Later Thursday, prosecutors issued a subpoena demanding the county to provide copies of surveillance video recorded at the county's East Ninth Street headquarters on the day Keenan was fired. The subpoena demands security video from three floors: the third floor, where Keenan's office

SEE INVESTIGATION, A6

# Investigation

**FROM A1**

in the fiscal department was located; the seventh floor, where Dykes' office and the human resources department is located, and the eighth floor, where Budish and Mason's offices are located.

The subpoena also seeks copies of all emails sent to and from Keenan's county email address.

Visiting Judge Patricia Cosgrove set an April 13 trial date during Thursday's telephone conference.

Yost's office declined to comment on the filings.

Jordan, in a brief phone interview Friday morning, said Dykes had "nothing to do with the decision to fire Keenan."

County spokeswoman Eliza Wing said in an emailed statement Friday afternoon that Mason decided to fire Keenan, and Dykes played no role in that decision.

An assistant county law director for labor and employment issues wrote a letter to Keenan as part of her firing, and ran it by Dykes "for content," Wing said. The move was in accordance with the county's normal procedures, Wing said.

Wing did not respond to follow-up questions, including whether Dykes suggested any changes to the letter and if his approval was required for the letter to be delivered.

Wing's statement did not answer other questions that Cleveland.com posed, including whether Dykes escorted Keenan anywhere throughout the building before or after her firing and whether Mason and the other county employees named as witnesses intended to testify if called at Dykes' trial.

Thursday's filings came a week after Keenan's ouster from the position she held since 2015. The administration has not explained the reasons behind the firing, telling cleveland.com only that the administration "decided to go in a different direction."

Keenan told cleveland.com in a series of emails that she considers herself a whistleblower who "knew where the bodies were buried." She also said she was planning to "sue the s--t out of them," and has since hired an attorney.

Keenan also claimed she had discussed retaliatory behavior with Mason days before her firing, which came one day after County Council approved Budish's budget for 2020 and 2021.

Her lawyer, Christopher Thorman of Thorman Petrov Group, did not respond to requests for comment.

Cleveland.com is awaiting responses from the county to public records requests for any whistleblower-type complaints, or human resources complaints filed by Keenan.

The charges against Dykes stem from a signing bonus he approved in 2017 to be paid to James Hay, who had just been hired in as the county's deputy chief information officer, according to his indictment. The county first agreed to pay Hay up to $15,000 in moving expenses as part of his job offer. Dykes then converted the payment to a $13,500 signing bonus after Hay said he didn't need that much for moving expenses by revising Hay's offer letter, which was an official government record, prosecutors said.

The payment flouted personnel policies approved by County Council that did not permit bonuses of the kind Dykes paid. But Dykes, Budish, then-Law Director Robert Triozzi and other cabinet officials defended the payment in a meeting with cleveland.com reporters and editors before the charges were levied by saying they did not believe they needed to follow the county's personnel manual.

Yost took over the case as a special prosecutor in February after Cuyahoga County Prosecutor Michael O'Malley recused himself.

Jordan told cleveland.com late last month that he and Dykes nearly had a deal with prosecutors earlier this month to plead no contest to the theft in office charge, but backed out of the deal after realizing that Ohio law bars anyone convicted of that charge to hold a government position again.

In addition to Keenan and Mason, prosecutors in Thursday's filing also added the following names to those potential witness list:

› Former Cuyahoga County Sheriff Frank Bova
› Human Resources Manager Yolanda Guzman
› Director of Employee and Labor Resources Eric Myles
› Deputy Inspector General Mark Cutwright
› Office of Budget and Management Manager Sybil Hainey
› Scot Rourke, the county's former IT director who was fired in October

Rourke's addition to the list comes after he filed a lawsuit against Budish and the county following his October firing. Rourke was fired after more than 19 months on unpaid leave, which he was placed on after he was named in subpoenas in the criminal probe of Budish's administration. County Council raised questions about why he remained a county employee.

Rourke has never been charged with a crime.

The former lawyer for the IT Department, Emily McNeeley, was placed on leave at the same time as Rourke after she was also named in subpoenas. McNeeley has since been indicted and left her county job.

# Ex-prison guard who smuggled in drugs gets nine months

**Sarah Volpenhein**
Marion Star
USA TODAY NETWORK

MARION – An ex-corrections officer was ordered to serve prison time Tuesday after he admitted to trying to smuggle drugs into a Marion prison.

Joshua D. Borders, 24, of Galion, was sentenced Tuesday to nine months in prison by Marion County Common Pleas Judge Warren Tom Edwards. The possible prison terms the judge could have imposed ranged from nine months to three years.

Borders was working as a corrections officer at North Central Correctional Complex, the privately-operated prison in Marion, when officers searching him at the prison found packages of tobacco and marijuana bound to his abdomen on Nov. 4, according to court records.

Borders is one of multiple ex-corrections officers charged within the last nine months with trying to bring drugs into the private prison.

Borders pleaded guilty last month to illegal conveyance of drugs of abuse onto a detention facility, a third-degree felony, in Marion County Common Pleas Court.

He told the judge Tuesday that he received $300 for agreeing to bring the drugs into the prison. Prosecutors alleged he met with inmates' family members to coordinate bringing the drugs into the prison in exchange for money, according to court records.

Borders told the judge Tuesday he did not know that he was bringing marijuana onto prison grounds, but upon questioning by the judge, acknowledged that he didn't want to know what was inside the packages.

There was about 159 grams of tobacco found in one of the packages and about 145 grams of tobacco and nearly 21 grams of marijuana found in the other package, according to an affidavit signed by an Ohio

## Borders

Continued from Page 1A

and to the burden it would cause his family if he were imprisoned. Borders has three children, one of whom is his wife's daughter whom he adopted, and a fourth child is due to be born in September, they said.

Through tears, his wife told the court that she would struggle to provide for their children if Borders was sent to prison and asked the judge to place him on probation.

An Ohio law that requires incarceration for prison workers who bring contraband

onto prison grounds does not apply to private Ohio prison staff.

Edwards said that Borders' crime was made more serious by the fact that he was a corrections officer when he committed it.

"You violated the public trust here and there's a lot of controversy over private prisons," he said. "I don't believe that the majority of prison guards ... would ever engage in the conduct you engaged in."

On top of the prison time, Edwards also imposed a $600 fine. Borders was handcuffed at the end of the hearing and was sent to the Multi-County Correctional Center until he can be taken to prison.

Other North Central Correctional Com-

plex guards have been accused of bringing drugs into the prison.

In November, a 20-year-old was sent to jail for 30 days after trying to bring 322 grams of marijuana into North Central, where he worked as a corrections officer.

A Richwood man, who turns 21 Wednesday, is facing charges he conspired to bring Suboxone and tobacco into the private prison as a corrections officer. The allegations against Fisher stem from a sting operation carried out by the Ohio Highway Patrol, which was acting on an inmate tip, according to court records.

*svolpenhei@gannett.com*
*740-375-5155*

# $19B disaster aid bill approved

After passing Congress, the bill goes to the president. A4

# PLAIN DEALER

2019 THE PLAIN DEALER   CLEVELAND.COM   MN

Mansfield **********************************************AUTO**ALL FOR ADC 440
Richland Correctional Librarian McGlaughlin          C045
1001 Olivesburg Rd                                   3
Mansfield OH 44905-1228

# ntroduces
# prevent
# oisoning



## Video released of overdose that led to indictments

### Security footage shows an inmate laying motionless for over two hours

Adam Ferrise  aferrise@cleveland.com

For more than two hours, Joseph Arquillo lay motionless on a mat inside the Cuyahoga County Jail before anyone bothered to check on him, jail security video released to cleveland.com shows.

A now-indicted officer at one point walked up, kicked his mat and walked away, leaving the 47-year-old inmate to sit another hour until another inmate alerted a different officer. By the time he ended up at MetroHealth, he was dead.

Cuyahoga County released video Friday from its downtown jail that shows Arquillo's slow death that is at the center of criminal charges against the former warden and the corrections officer accused of ignoring him while he died.

Cleveland.com spent months battling with the county over the video. The county initially denied the video's release, and cleveland.com filed a complaint with the Ohio Court of Claims on grounds that videos of various instances of suspected wrongdoing at the jail are in the public's interest. The county relented and released the video Friday amid ongoing mediation ordered by the Ohio Court of Claims.

It was the second video released by the county related to criminal charges against jail employees.

The most recent video shows the circumstances surrounding Arquillo's Aug. 27 death.

A grand jury indicted former warden Eric Ivey in April accusing him of ordering corrections officers to turn off their body cameras as the investigated how Arquillo died.

Ivey told investigators that he ordered the officers to disable their body cameras to protect Arquillo's medical privacy "when his true purpose was to prevent the evidence from being used in an official proceeding," according to

SEE VIDEO, A9

# Video

FROM A1

Also charged in the case is corrections officer Martin Devring, the officer accused of ignoring Arquillo and falsifying documents that said he made his required checks on inmates. The video shows Devring sometimes walking a few feet, then back to his seat and marking down that he checked on all the inmates.

The video shows a routine morning in the pod where Arquillo died. It also illustrates some of the spartan conditions in which Cuyahoga County Jail inmates are required to live. Napping inmates lie on thin mats as Arquillo lay on the floor slumped against the bottom rung of a built-in shelf.

Arquillo, who had been booked into the jail about 3 a.m. that day on a probation violation, laid down next to his mat about 9 a.m. for about 45 minutes.

He and Devring had a short interaction about 9:15 a.m.

An officer escorted Arquillo to the medical unit. He returned to his mat about 15 minutes later and told Devring he didn't want to eat breakfast, according to documents previous obtained by cleveland.com.

After returning to his mattress about 10:15 a.m., he bent his knees several times, bobbing up and down for about eight minutes as he grabbed at his head. He

hunched over with his head pointed toward the ground and made a slow crawl toward the ground where he curled up next to the mattress.

He was there for an hour and 10 minutes before Devring walked up, kicked his mat and walked away.

Devring in interviews with investigators said he asked Arquillo if he wanted to eat lunch. He said Arquillo responded by mumbling and saying he wasn't hungry and just wanted to sleep, documents say.

In the video, Arquillo



Cuyahoga County corrections officer Martin Devring faces criminal charges for his actions surrounding the death of jail inmate Joseph Arquillo on Aug. 27. Arquillo slumped over next to his mat, where he remained for two hours. Cuyahoga County released the video after months of stalling public record requests. *Cuyahoga County video*

doesn't appear to move when Devring walks up. There also doesn't appear to be any interaction between the two.

An inmate about 12:50 p.m. finally noticed the awkward position in which Arquillo was lying and called over another inmate. The inmates summoned a corrections officer who filled in for Devring during his break.

That officer is seen on the video calling for a medical team. The guard gave Arquillo CPR until other officers and medical staff arrived. An ambulance took

him to MetroHealth.

He didn't survive.

Ivey can be seen on the video walking into the jail about 1:10 p.m. He talked with several officers during the 20 minutes he remained in the pod. He stayed after paramedics wheeled Arquillo out on a gurney, making calls and looking through documents before leaving about 1:30 p.m.

Devring, 60, was charged in February with tampering with evidence, dereliction of duty and interfering with civil rights. He was fired Dec. 4 for his actions related to

the death.

The county medical examiner ruled that Arquillo died with heroin, fentanyl, cocaine and Valium in his system.

His was one of seven deaths in 2018 inside the troubled county jail the U.S. Marshals Service deemed "inhuman" in an inspection that took place months after the first inmate died in June of last year. Another inmate died this year.

Ivey and eight jail officers have been indicted in the corruption investigation that began as an inquiry into the county's IT department. That investigation has since pivoted to include suspected wrongdoing at the jail.

A total of 12 people are currently indicted, and federal authorities are investigating the jail for possible civil-rights violations. Ivey's former boss, jail director Ken Mills, was also indicted on accusations that he lied to investigators and Cuyahoga County Council about his role in blocking the hiring of nurses at the jail.

A federal grand jury issued a subpoena in December asking for records of the first seven inmate deaths, including Arquillo. They also sought sweeping documents of inmate abuse by officers and records of inmates who received no or poor medical care in the jail.

*To see the entire video, go to https://tinyurl.com/cuyjail-video9).*

## CLEVELAND

### Jail officer sold heroin, vape pens and cellphones to inmates, indictment says

A Cuyahoga County Jail officer under investigation as part of a probe into a possible drug ring involving other jail officers is accused of selling heroin, cellphones and vape pens to inmates, according to court records.

A 12-count indictment handed up Thursday says Officer Stephen Thomas sold drugs and other contraband to inmates. On Jan. 18, he sold heroin to an inmate who survived a drug overdose in the jail, the indictment says.

Thomas, 27, is charged with corrupting another with drugs, bribery, fentanyl trafficking, obstructing justice and other offenses in the case. He is scheduled to be arraigned May 31.

Thomas has been on unpaid leave from his job since the day after his May 8 arrest.

He is among 12 people charged in an Ohio Attorney General's Office investigation that began as a probe into possible corruption in Cuyahoga County's IT department. The investigation has since pivoted to look at the troubled jail, where eight inmates died in 2018 and another died last week.

# Officials ignored inmate's pleas for help before suicide, new lawsuit says

DECEMBER 13, 2019

**Adam Ferrise** *aferrise@cleveland.com*

CLEVELAND PLAIN DEALER

EXHIBIT —

The family of a man who hanged himself in the Cuyahoga County Jail sued the county on Thursday and said jail officials ignored clear signs that he planned to harm himself.

Gregory Fox, one of eight inmates who die in the jail in 2018, showed signs of "obvious distress" and made "pleas for help" before he took his own life in his jail cell, according to the federal lawsuit. Fox was one of four inmates who died as a result of suicide at the jail last year.

Civil rights attorney Sarah Gelosimo filed the complaint in the U.S. District Court in Cleveland. It's the latest in a string of lawsuits over conditions at the jail and the treatment of inmates, including one asking a federal judge to grant class-action status and to appoint an independent monitor to ensure reforms are made at the jail.

"They completely failed Greg," Gelosimo said Thursday during a news conference.

Cuyahoga County spokeswoman Eliza Wing did not immediately return messages seeking comment.

Fox, 36, hanged himself with a bedsheet in his cell on Aug. 28, 2018. He died at Metro-Health two days later. He told jail staff that he suffered from mental illness and had prior suicidal thoughts, the lawsuit says. He required psychiatric treatment and medication, the lawsuit says.

Jail officials failed to undertake a proper evaluation of Fox when he was booked into the jail, and guards did not put him on suicide watch to ensure his safety, the lawsuit says. He had been placed on suicide watch when he was booked into the jail earlier in the month, Gelosimo said. But when he returned in late August, jail officials did not put him on suicide watch.

Corrections officer Ingrid DiMarino was assigned to supervise two clusters of cells that included about 100 inmates, including Fox, as a result of understaffing, the lawsuit says. She had never before supervised two pods at one time.

DiMarino and other officers failed to monitor Fox. DiMarino discovered Fox hanging in his cell, the lawsuit says.

"Despite Defendants' knowledge of Gregory Fox's despondency, and his need for mental health care, and risk of injury, they were deliberately indifferent to his risk of suicide," the lawsuit says.

Fox at the time was jailed on $125,000 bond in two cases — one in which he was accused of repeatedly raping a 13-year-old girl during an 18-month span in North Royalton and for repeatedly calling and harassing the girl in an attempt to get her to drop charges against him.

Fox, in a call from jail to the girl, said there was "probably no way I am going to survive." He told the girl: "You've made sure I will die"



and asked the girl to say in court that she lied about accusing him of rape.

He had pleaded not guilty to the rape charges and was awaiting arraignment on charges of intimidation of a crime victim.

The deaths at the jail sparked an FBI civil rights investigation and a criminal investigation by the Ohio Attorney General's Office that has so far netted indictments against several jail officials and corrections officers, including two cases involving the death of another inmate.

A November 2018 U.S. Marshals report detailed "inhumane" conditions for inmates, including officers withhold food as punishment, inedible food and excessive use-of-force by officers against inmates.

The lawsuit filed Thursday is the second against the county over a 2018 inmate death. The estate of inmate Larry Johnson filed a federal suit in March. Johnson's lawsuits made similar claims that jail officials ignored clear signs that he was suicidal.

Medical examiner notes viewed by cleveland.com said Fox suffered from bipolar disorder and anxiety and had attempted to commit suicide in January 2018 by overdosing on prescription pills.

Fox's sister, Wendy, who did not want to be identified by her last name, said her brother suffered from mental illness and was trying to build his life.

"He was a son, and an uncle. He was a family member," she said. "He suffered in life with mental illness and he desperately wanted to be a functioning member of society. He tried. He was trying."

**Gregory Fox, below,** was one of eight inmates who died during incarceration at the Cuyahoga County Jail in 2018. Fox showed signs of "obvious distress" and made "pleas for help" before he took his own life in his jail cell, according to the federal lawsuit. Fox's family sued Cuyahoga County on Thursday. Submitted by Fox family



# Former inmates question Portage jail investigation

**Prisoners who have filed complaints about abuse, neglect ask why sheriff is leading review**

By Eileen McClory
GateHouse Media Ohio

With 16 complaints filed with Portage County commissioners against the county jail and an additional lawsuit pending in U.S. District Court, the Portage County Sheriff's Office has begun to investigate the allegations.

At least three of the people who have complained about conditions in the county jail are asking why the sheriff's office is seemingly investigating itself.

"I just don't understand why it's legal for them," said Austin Frederick, a former inmate at the jail who has filed a complaint with commissioners alleging abuse.

Frederick says it would be "witness tampering" if he tried to investigate a crime he committed, and he doesn't see why it's different for the sheriff's office. He filed a writ of mandamus in the 6th Circuit Court of Appeals on Friday asking that the sheriff's office turn over the investigation to the Ohio Attorney General's Office.

Amanda Griffiths, the resident who is in prison for check fraud. Another complaint sent by Frederick to commissioners is simply a letter. Frederick is no longer in prison.

The rest of the complaints have been filed by inmates who are currently incarcerated at the Lake Erie Correctional Institution in Lorain, where a private company working for the state, CoreCivic, has been working with inmates to take statements, notarize them and send them to Portage County commissioners.

The complaints allege inmates were pepper-sprayed in restraint chairs, placed into "Court Hallway" — a room that inmates described as cold and without water other than a toilet, that corrections officers skipped inmates for meals, that inmates were refused medication or medical treatment, and that inmates were forced to clean up blood and other fluids from the ground after corrections officers allegedly beat inmates.

All of the former inmates have felony convictions. Some of them are serving decades in prison.

The Portage County Sheriff's Office says so far it has found no evidence that anyone who has made complaints

In 2015, an investigation from the State Fire Marshal "revealed deficiencies" that weren't specified in the report, and the state noted that the files on training for corrections officers weren't available for them to look through during their visit. Both issues were later corrected by the sheriff's office, and the jail passed inspection.

In 2017, the state said the suicide prevention plan that is required for all county jails was not updated. The sheriff's office again corrected the deficiencies in later forms to the ODRC.

The Bureau of Adult Detention is charged with inspecting Ohio's 88 county jails. To be found in compliance, the state requires all jails to meet 52 "essential" standards and 90% of "important" standards. If a problem is found, sheriffs and jail administrators must submit plans to correct the problems found by state inspectors.

Members of the Portage County grand jury also are supposed to inspect the jail on a four-month basis. The Record-Courier asked for and received all the grand jurors' comments from between 2015 and 2019. Most negative comments from grand jurors were about inmate overcrowding, doors within

an additional $1 million and added job openings in the central office. The ODRC said the increase had led to 10 more staff members at the Columbus office, including six new jail inspectors. The total number of jail inspectors in Ohio is now nine, up from three jail inspectors last year.

Under Ohio law, the bureau is primarily charged with regulations, not with investigating specific complaints, a spokeswoman said.

"The Bureau of Adult Detention primarily serves a regulatory role with the objective of improving operations in the jails," spokeswoman JoEllen Smith wrote in an email.

When multiple deaths occurred at the Summit County Jail in 2018, Summit County asked Stark County to investigate the deaths. Stark County prosecutors cleared Summit County jail officials of any wrongdoing.

Commissioner Vicki Kline said the commissioners are taking the complaints seriously, but they do not have authority over the sheriff's office.

Doak is an elected official and is not appointed by or overseen by county commissioners. The commissioners set the budget for the sheriff's

# Municipal judge calls for outside review of Lakewood jail

## Two recent inmate incidents lead to policy changes at the facility

**Evan MacDonald** emacdonald@cleveland.com

Lakewood Municipal Court Judge Pat Carroll has called for an independent review of the suburb's jail after one inmate was caught sharing medication and another inmate was mistakenly released from a hospital.

In a letter to Mayor Mike Summers, Police Chief Timothy Malley, Law Director Kevin Butler and City Council members, Carroll also requested additional oversight for the city's police department in case similar issues arise in the future.

He suggested in an interview with cleveland.com that issues could be reported to city administrators or elected officials. The city could also form an oversight committee comprised of citizens, he said.

"As a judge, I need the confidence that when someone's ordered to jail, they're going to be in a safe, drug-free environment," Carroll said Wednesday. "And when they're ordered to jail, they're not going to be released."

Carroll suggested the review be done by an outside agency such as the Ohio Attorney General's Office or the U.S. Marshals Service, which disclosed "inhumane conditions" at Cuyahoga County's main jail in a review conducted a year ago.

**SEE JAIL REFORM, A7**



The I
Depa
sever
proc
ing i
Johns

---

# Jail reform

FROM A1

He noted that his court only learned of the two Lakewood Jail incidents through happenstance.

One of the inmates involved in the drug-sharing scheme informed a probation officer, and court officials were the first to discover the hospitalized inmate had been mistakenly released.

"My concern is, what happens the next time?" Carroll said. "We may never know about it."

Malley told cleveland. com on Wednesday that his department has already addressed the problems raised by the two Lakewood Jail incidents. City officials have not made a formal decision on whether to request an outside review, but Malley does not think one is needed.

"We've made some changes," he said in a phone interview. "We've updated our policies. We don't anticipate this is going to happen again."

City Council President Sam O'Leary said Wednesday that council members are monitoring the back-and-forth, but have not weighed in on the need for an outside review. He referred questions to the mayor and police chief.

Summers could not be reached for comment Wednesday.

learned the man had been mistakenly released. The court issued another warrant for his arrest, and authorities took him into custody the next day, Carroll said.

Malley said the police department has addressed the issue by creating a form that will be sent with

## HOW WAS AN INMATE MISTAKENLY RELEASED?

Lakewood police officers arrested a Bay Village man on Sept. 4 for a probation violation related to a 2018 conviction for theft and receiving stolen property, both first-degree misdemeanors, according to court records.

The man was determined to be suicidal, so officers took him from the jail to Marymount Hospital, where he was held in protective custody until Sept. 30, Malley said.

His mistaken release was due to a miscommunication, Malley said.

A Marymount Hospital employee called the police department to ask whether the man had an active warrant for his arrest. A police dispatcher said the man did not have an active warrant because he was already listed as being in custody at the jail, Malley said.

The following week, a municipal court employee called the hospital and

inmates receiving hospital treatment. The form includes guidelines for the inmate's release.

Police dispatchers also have been given a list of inmates being treated at hospitals, he said.

"As soon as we found out this occurred, we took steps to remedy it," Malley said.

## WHAT ABOUT THE JAIL MEDICATION SHARING?

Jail officers discovered Oct. 17 that an inmate who had been prescribed Suboxone, a drug to treat opioid addiction, was sharing the medication with three other inmates.

The medication is designed to dissolve under the tongue. Jail officers learned the inmate took the drug out of his mouth before it dissolved, and passed it to other inmates, Malley said.

An administrative review of the matter determined the incident was "fairly unique," according to records provided by the police department.

"Even so, with the proper application of our policy, the medication must be observed to be completely dissolved." Malley wrote in a Nov. 12 summary to Summers. "Clearly this is a serious incident with misuse of a prescription medication a risk to the prisoner population."

Four jail officers were issued corrective action forms as a result of the investigation, Malley told Summers in the summary.

The police department also updated its jail policy regarding medication, to ensure that inmates are monitored until medication is fully digested, Malley said.

The inmates involved in the medication-sharing scheme were disciplined by being placed in isolation, according to jail records. The police department is still investigating to determine whether any of the inmates should face criminal charges.

Richland
1001 Olivesburg Rd
Mansfield OH 44905

# 12 HAVE BEEN INDICTED SO FAR

**Investigation:** A probe of contracts in the county IT department has expanded to allegations of corruption in other offices and operations at the troubled jail



# The 12 indicted so far in the county corruption investigation FROM PAGE A1



### EMILY MCNEELEY, FORMER CUYAHOGA COUNTY IT GENERAL COUNSEL

McNeely was the first target of the corruption investigation. Prosecutors had been subpoenaing information related to the county's IT department since January 2018.

She was the county IT department's general counsel and director special initiatives. She faces charges, including felony counts of telecommunications fraud, tampering with government records and having an unlawful interest in a public contract.

Some of the charges relate to her failure to disclose to County Council at a Sept. 19, 2016 meeting that her father was convicted of being bribed by Ciber Inc., a company that was seeking a $9 million contract with the county.

She also failed to disclose the fact that Ciber had a "record of defrauding other states with whom (Ciber) had contracted," according to prosecutors.

County Council awarded contracts to several vendors in connection with its ERP computer project in 2016. Two of the vendors were Ciber and Infor Public Sector inc. Ciber filed for bankruptcy protection in April of 2017 and Infor took over the work Ciber had been doing.

The charges against McNeeley also include having an unlawful interest in public contracts. Prosecutors said she "managed and steered" contracts with Hyland Software, where her spouse worked and owned stock.

She pleaded not guilty to charges.



### DOUGLAS DYKES, CUYAHOGA COUNTY CHIEF TALENT OFFICER

Dykes has been charged with theft in office and tampering with government records, both felonies, along with misdemeanor charges of obstructing official business and making a false statement. He has pleaded not guilty.

Dykes was charged in connection with the payment to then-Deputy Chief Information Officer Jim Hay. Prosecutors say Dykes asked for, but did not receive, authorization from the county to change the payment to Hay from moving expenses to a signing bonus, then lied to an unnamed county employee about then-Law Director Robert Triozzi approving the change.

The payments to Hay and the other employees circumvented approval by Cuyahoga County Council.

Dykes was hired as chief talent officer for the county at the end of 2015. His job is to oversee human resources operations.



### KEN MILLS, FORMER CUYAHOGA COUNTY DIRECTOR OF CORRECTIONS

Mills is the former Cuyahoga County Jail director of corrections. He was promoted to that position despite having no previous experience in corrections.

Under Mills' direction, jail administrators cut costs for basic items for inmates as he spearheaded a Budish-driven plan to regionalize the county's jails. The plan was pitched to cities as a way for them to save money on running their own jails. The county charged $99 per day per inmate and banked on that money, along with plans to cut costs by switching nursing and food providers, as a way to make more money for the county.

After Cleveland transferred their inmates over to county custody beginning in March, the jail became packed, putting pressure on a jail that already had a lack of corrections officers and other issues.

Seven of the eight inmates who died in 2018 were in the jail while Mills was in charge. He resigned in November, ahead of a U.S. Marshals report that described "inhumane" conditions for inmates, including that inmates were denied consistent access to medical and mental health care.

Mills is charged with felony counts of tampering with government records and telecommunications fraud, accused of lying during a May 22 Cuyahoga County committee meeting about his role in blocking the hiring a nurses at the county's three jails — the main one in downtown Cleveland and two satellite jails in Bedford Heights and Euclid.

He later lied to investigators "about his interactions with a high-level Cuyahoga County official," according to prosecutors. Those actions resulted in misdemeanor falsification and obstruction of official business charges.



### WARDEN ERIC IVEY

Ivey was the jail's warden from May 2017 until he was demoted in February after supervising his wife's supervisor, according to a county inspector general investigation.

Ivey was singled out in the marshal's report that said he ordered food withheld as punishment for some inmates, failed to make weekly visits to the jail and did not check on inmates being held in isolation. He also failed to supervise the jail's Special Response Team, whose officers are accused of threatening, harassing, intimidating and attacking inmates, according to the marshals' report.

In the criminal case, Ivey is accused of ordering officers to turn off their body cameras during the investigation into the Aug. 27 death of inmate Joseph Arquillo, and later being untruthful to investigators about why, according to the indictment.

Ivey told investigators that he ordered the body cameras turned off because he wanted to protect Arquillo's medical privacy "when his true purpose was to prevent the evidence from being used in an official proceeding," the indictment says.

Ivey remains on the county's payroll after his April 18 indictment on charges of tampering with records, a third-degree felony, and a first-degree misdemeanor count of falsification.

Ivey was put on paid administrative leave one day after the charges were filed. He makes $93,000 per year.



**CORRECTIONS OFFICER MARTIN DEVRING**

Devring is also charged in connection with Arquillo's death. The longtime corrections officer was fired about five months after Arquillo's death and while the case was under investigation.

Devring is accused of ignoring Arquillo as he was dying of a drug overdose inside the jail and lying about making his required checks on inmates.

Devring walked up to Arquillo's mat on the jail floor, kicked the mat and walked away despite Arquillo being in an "unnatural position" that showed he was clearly in distress, according to records obtained by cleveland.com.

He was charged April 8 with tampering with evidence, dereliction of duty and interfering with civil rights. Devring has pleaded not guilty to the charges.



**CPL. IDRIS-FARID CLARK**

Clark is accused of strapping 29-year-old inmate Chantelle Glass to a restraint chair on July 16, 2018 and unleashing about a half-can of pepper spray in her face from about a foot away.

Glass said she ended up in the restraint chair after repeatedly asking for and being denied a phone call, following her arrest in connection with a domestic dispute.

The indictment says Glass complied with the officers and got into the restraint chair before Clark pepper-sprayed her.

Instead of taking Glass to get medical treatment, they locked her in a small cell by herself, poured water over her and left her there for two hours by herself, Glass said.

Clark was indicted April 8 and charged with felonious assault, a second-degree felony, and first-degree misdemeanor counts of interfering with civil rights and unlawful restraint.

He was placed on unpaid administrative leave after the indictment.



**OFFICER ROBERT MARSH**

Marsh is also charged in connection with the attack on Glass. He is accused of punching her in the head after she was strapped to the chair and before Clark pepper-sprayed her.

He pleaded not guilty at his arraignment to misdemeanor charges of assault, interfering with civil rights and unlawful restraint.

He was placed on unpaid administrative leave after the indictment.



**CPL. NICHOLAS EVANS**

Evans on March 22, 2019 purposefully turned off his body camera and attacked inmate Terrance Debose while Debose was strapped to a restraint chair, according to the indictment.

Evans repeatedly punched Debose in the head, causing him to suffer a concussion, according to court records.

Evans and another officer left Debose in the restraint chair for two hours, depriving him of his constitutional right to get medical treatment, the indictment says.

Evans is charged with second-degree felonious assault, third-degree felony tampering with evidence, and misdemeanor counts of unlawful restraint and two counts of interfering with civil rights.

He was placed on unpaid administrative leave after the indictment.



**OFFICER TIMOTHY DUGAN**

Dugan is charged along with Marsh in the March 22 incident. He is accused of punching Debose in the head several times.

He is charged with second-degree felonious assault and misdemeanor counts of unlawful restraint and two counts of interfering with civil rights.

He is on unpaid administrative leave.



**OFFICER JOHN WILSON**

Wilson, an officer on the jail's maligned Special Response Team, beat 21-year-old inmate Joshua Castleberry after Castleberry asked for an extra sandwich on Feb. 8, 2018, according to prosecutors and an incident report.

Castleberry is a veteran of the United States Army who was in the jail after an arrest on charges of domestic violence and attempted assault of a police officer.

Wilson is accused of punching Castleberry several times, knocking out two of Castleberry's teeth, including one that got lodged in Castleberry's nasal cavity.

He suffered a broken nose and needed facial reconstruction surgery to repair the damage from the attack, the indictment says.

Wilson and another officer strapped Castleberry to a restraint chair and left in him alone in a small isolation cell, the indictment says.

Wilson is charged with felonious assault, interfering with civil rights and unlawful restraint.

He is on paid administrative leave.



**CPL. JASON JOZWIAK**

Jozwiak was charged along with Wilson in the incident. He is not accused of attacking Castleberry.

He is accused of refusing to allow a nurse to give Castleberry medical attention after the attack. Jozwiak then lied to investigators about being in the isolation room along with Castleberry and Wilson and blocking the nurse, according to the indictment.

He is charged with falsification and interfering with civil rights.

He is on paid administrative leave.



**OFFICER STEPHEN THOMAS**

Thomas, also a member of the jail's SRT, is accused of selling drugs to inmates while on duty. Cuyahoga County Sheriff detectives on May 8 watched Thomas on surveillance video go into an inmate's cell, then leave. The investigators went into the cell immediately after and found 10 oxycodone pills, according to court records.

The deputies arrested Thomas in the Justice Center shortly after and found he had $1,409 in cash, and a small piece of a plastic glove that contained suspected drugs, court records say. Investigators also seized a cellphone.

On Thursday, he was indicted by a grand jury on 12-counts. Thomas, 27, is charged with corrupting another with drugs, bribery, fentanyl trafficking, obstructing justice and other offenses in the case. He is scheduled to be arraigned May 31.

Prosecutors in the case said Thomas is suspected of being part of a larger network that smuggled drugs and other contraband into the jail. Investigators also have evidence connecting Thomas to an April 8 smuggling incident in the jail and to an inmate's drug overdose, prosecutors said during a court hearing.

Thomas has not yet entered a plea in the case or hired an attorney. Thomas filed for bankruptcy about a month before his arrest.

The county placed Thomas, who was hired in February 2018, on unpaid administrative leave, county records say.

# CEBOOK
# 'ENING IN?

8-20-19



anscribe audio clips from users of its Messenger service. *Jenny Kane, AP file*

## after it's revealed that humans reviewed user Messenger audio

Associated Press

> tran-
senger
a com-

mmon
he use

wide while it investigates the Dutch leaks. Apple has also suspended its use of humans for the Siri digital assistant, though it plans to bring them back after seeking explicit permission from users. Amazon said it still uses humans, but users can decline, or opt out, of

**"We feel we have some control over machines. You have no control**

---

# Associate warden pleads guilty

## Eric Ivey will cooperate with the investigation into jail conditions

**Cory Shaffer** *cshaffer@cleveland.com*

The associate warden of Cuyahoga County's troubled jail system pleaded guilty Monday to two misdemeanor charges that accused him of ordering corrections officers to turn off their body cameras after an inmate died of a drug overdose, and lying to investigators probing the death.

Eric Ivey, the former longtime warden whose persona has been ubiquitous with the county lockup, agreed as part of the plea to resign his position at the jail, cooperate with investigators and testify truthfully in ongoing investigations into the conditions in the county jail and potential corruption in Cuyahoga County government.

Ivey pleaded guilty to obstruction of justice and falsification. He faces a sentence of anywhere from probation to up to a year behind bars at the Cuyahoga County Jail that he once supervised.

Cuyahoga County Common Pleas Court Judge Nancy Fuerst accepted Ivey's plea, and set sentencing for Sept. 30.

Investigators agreed to end any investigations into allegations they are currently aware of involving Ivey, but reserve the right to probe any future accusations against the jail's former warden.

Ivey declined to comment when approached after the hearing.

Ivey, 54, of Euclid, was singled out in a damning November U.S. Marshals Service report as someone who facilitated civil rights violations of inmates at the jail, where eight inmates died in 2018. Cuyahoga County Executive Armond Budish's administration admitted to cleveland.com last month that its human resources department conducted no internal investigation into the claims against Ivey

SEE JAIL, A8

meetings that the jail was under budget, the lawsuit says.

"(Mills') orders came straight from the top," the lawsuit says. "He faithfully executed Budish's mandate to cut costs at any cost and conceal the deadly consequences from the public."

One of those measures was keeping the jail's staffing level low. Staffing levels reached critical levels in 2018 when Mills and Budish tried to execute a plan to take in inmates from other communities and regionalize the county's municipal jails in order to make more money, the suit says.

The understaffing led to an increase of repeated forced lockdowns of inmates, called red-zoning.

That caused between 100 and 200 inmates to live on lockdown under the supervision of only one officer. The lawsuit says Brack complained about the red-zoning to Mills after 30 inmates from the same locked-down cluster of cells reported having chest pains so they could get out of their cells. The inmates were locked down for nearly 24 consecutive hours, the lawsuit says.

In 2017, Mills ordered that jail medical personnel were no longer allowed to join jail officers in conducting rounds of inmates with mental illnesses who were being housed in isolation, according to the lawsuit.

Brack told Mills that medical staffing is necessary to help address behavioral issues, but Mills said: "I run the jail," according to the lawsuit.

### THE BEATING

Mills in February 2018 also helped cover up a violent attack of an inmate by a jail guard, according to the lawsuit.

The lawsuit does not name the guards, nor the inmate who was attacked, but Chandra confirmed that it's the same case that became the subject of an April 18 indictment.

Jail officer John Wilson was indicted on a felonious assault charge in the attack more than a year after the incident happened.

Joshua Castleberry and Wilson fought over a bologna sandwich. Wilson attacked Castleberry and knocked out two of his teeth, including one that became lodged in his nasal cavity, the indictment says.

Officers placed Castleberry in a restraint chair and placed a mask over his face to hide his injuries, according to the lawsuit.

The guards refused to let nurses remove the mask. One nurse asked to do a medical evaluation but a jail officer replied: "He wants to hit one of my officers, he can sit the f--k there for hours," according to the lawsuit.

The nurse called Brack, who called a jail supervisor and demanded nurses have access to treat Castleberry. A half-hour later, the nurses were allowed to see Castleberry, who was rushed to MetroHealth for facial reconstruction surgery, according to the lawsuit.

get hearing in front of County Council about Mills' plan to privatize nursing at the jail by switching contacts from MetroHealth to an Alabama-based company called NaphCare.

Council asked Pinkney who came up with the idea switching jail healthcare. Pinkney knew it was Mills but told council he didn't know because he feared backlash or retaliation from Budish, according to the lawsuit.

After the meeting, Pinkney told Brack that Budish specifically told him to be "politically correct" during the meeting.

"I talked with Budish and I can't just throw Mills under the bus to humiliate Budish," Pinkney told Brack, according to the lawsuit.

Corruption investigators later sought records relating to NaphCare during a Feb. 14, 2019 raid on Budish's office, according to a copy of the search warrant previously obtained by cleveland.com.

On Friday, Pinkney tendered his resignation. County spokeswoman Mary Louise Madigan said that the county will begin an immediate search for his replacement.

### THE MEETING

The blow-by-blow of the meeting is well-known. Mills asked for emergency money from the council to hire nurses at the county's Bedford Heights Jail.

The council wanted to know why a nursing shortage seemingly popped out of nowhere. They called Brack and Platten to answer questions, along with Mills.

Platten instructed Brack prior to the hearing to refrain from criticizing the county, the lawsuit says.

When council members didn't get clear answers from Mills, they asked Brack. Brack said Mills created an unsafe environment when he blocked the hiring of nurses, that Mills meddled in health care and made the jail's medical unit unsafe for nurses when he scaled back security.

He also pointed to a rift between Mills and Pinkney that hindered MetroHealth's ability to administer proper healthcare at the jail.

On Thursday, Metrohealth rebutted other claims in the lawsuit including what Platten told Brack. The lawsuit says Platten instructed Brack, prior to the committee hearing, not to criticize the county — a move that the lawsuit claims amounts to a violation of Brack's First Amendment rights. MetroHealth rejected the characterization about the arguing, that Platten's instructions were not "nefarious," but rather were "normal preparations for an official presentation to County Council."

"The lawsuit will sort out the legal issues," MetroHealth says in its statement, "but MetroHealth will not sit back and permit Mr. Chandra's unfounded and defamatory statements to be left unaddressed. While many of his assertions are patently false, Mr. Chandra disregards facts and instead chooses to smear and grossly mislead ...")



Gary Brack, middle, with attorneys Subodh Chandra, left, and Ashlie Sletvold, during a news conference following the filing of Brack's whistleblower lawsuit against Cuyahoga County. *Adam Ferrise, cleveland.com*

### THE FIRING

The next day, Budish and his former Chief-of-Staff Earl Leiken drove to MetroHealth, met with Boutros and demanded Brack's ouster from the jail, according to the lawsuit and records obtained by cleveland.com.

"Rather than address (Mills') conduct at the jail, or any of the serious issues Nurse Brack aired, Budish retaliated for exposing his lieutenant's malfeasance and embarrassing his administration," the lawsuit says.

Boutros complied, and Brack was removed from his job and placed on administrative leave.

MetroHealth officials Dr. Julia Bruner and Emily Fiftal wrote in their disciplinary letter to Brack that MetroHealth had no choice but to comply with Budish's request. Metro-Health disciplinary records say that Brack's testimony caused "immediate damage to MetroHealth's relationship with Cuyahoga County," and required "immediate attention and renewed commitments from members of MetroHealth's executive leadership."

The disciplinary document also says that Brack acted outside the scope of his employment when he offered his testimony, a key component to the whistleblower claim, according to the lawsuit. Brack says he had an ethical obligation to report issues that related to poor inmate care.

Chandra on June 29, 2018 called Metro-Health and said Brack would have claims of workplace discrimination and other rights violated if they fired him, according to the lawsuit.

MetroHealth attorney Laura McBride responded on July 10 that MetroHealth offered Brack two lower-level jobs that would allow him to remain employed with the hospital.

Brack refused and was fired Aug. 29, 2018.

His ouster caused employees to become "afraid to explain how the jail became one of the worst in the nation because they feared

retaliation," according to the lawsuit.

### THE AFTERMATH

After the May 22 meeting, seven inmates died, leading to intense scrutiny of the jail. Budish asked the U.S. Marshals Service to conduct an inspection.

Mills resigned Nov. 14, a week before the marshals released their report that detailed "inhumane" conditions at the jail, including inmates with medical and mental illness didn't get proper or consistent treatment, excessive use-of-force by guards and myriad of other issues.

The FBI began an investigation into possible civil rights abuses at the jail.

The Cuyahoga County Prosecutor's Office also pivoted its sprawling investigation into possible corruption in the county's IT department to include the problems at the jail.

Mills was accused in a criminal indictment of lying during the May 22, 2018 meeting, and later lying to federal and county investigators about his communications with a "high-level Cuyahoga County official." He pleaded not guilty to the charges.

The Ohio Attorney General's Office took over the case, and nine others at the jail have since been indicted, including Ivey. He was accused of ordering officers body cameras shut off during an investigation into an inmate's death.

The deaths prompted Cleveland Municipal Judge Michael Nelson to request that the county's jail operate under a consent decree that would dictate mandatory reforms through an agreement with the U.S. Department of Justice and the oversight of a federal judge. A civil lawsuit filed in December on behalf of inmates also calls for a similar agreement.

*Cleveland.com reporter Courtney Astolfi, contributed to this article.*

## CUYAHOGA COUNTY JAIL



Surveillance video shows a Cuyahoga County Jail officer attacking a mentally ill inmate strapped to a chair. *Submitted by Cuyahoga County*

# Video: Officer turns off body camera, beats mentally-ill inmate

**Adam Ferrise** *aferrise@cleveland.com*

and could be closed because of a
..g, *The Plain Dealer*

**..tions**

..dams Business Careers
..h West, Design Lab

..e. Case.

..in Luther King
..e Addams programs;
..ted.

## ..l to have 23

..i no details on when that would hap-
..lor why the department continues to
..it understaffed.
..lliams told City Council in March that
..pected to have 23 homicide detectives
..e unit by the end of the year. He had 14
..tives at the time.
..lliams made the promise after an
..me tax increase approved by voters

**HOMICIDE UNIT, A7**

Forum, A16    Spo..
..cribe or report delivery

OCTOBER 2019

# CUYAHOGA COUNTY JAIL

# Officers waiting to be sentenced still getting paid

**Adam Ferrise**  *aferrise@cleveland.com*

Two Cuyahoga County Jail corrections officer who admitted in court Tuesday to felonies that accused them of pummeling an inmate strapped to a restraint chair are still getting paid.

The county continued to pay Cpl. Nicholas Evans and officer Timothy Dugan since June, when county officials ordered they start being paid, according to county records.

County officials have taken no action to place Evans and Dugan on unpaid leave or otherwise discipline them since they pleaded guilty earlier this week. Both agreed to resign from their positions at their Dec. 12 sentencing.

Ohio law says the county can only put employees on unpaid leave for two months before requiring them to resume paying their base salary. Once an employee pleads

SEE JAIL OFFICERS, A7

**THE H..**

..e physical requ..
..i include stacki..
..rs into insert..
..i assembling b..
..ced environme..
..provided.

..selected candi..
..rug test.

..ase send your ..
..PDF format to:

..umanresources@plaind.com
..nd include "Packager" in the
subject line, or fax to

**Ohio:** Columbus — The prison system plans to ask a state board today for an emergency 16% increase in the budget for inmate health care, saying that increased costs led to a $22 million shortfall. The increase would boost the system's overall health care budget to about $140 million for the year. The request comes a year after a report found that Ohio's prisons should hire more doctors and nurses and expand some facilities.

Opportunity Employer

# THE PLAIN DEALER



*OCTOBER 2019*

CUYAHOGA COUNTY

# Jail food contract put on hold

## Quality concerns: Council cites problems with bidder's service at other jails, prisons

Courtney Astolfi  castolfi@cleveland.com

A Cuyahoga County Council committee is holding up a proposed contract with Trinity Services Group for jail food services until members get answers about news reports of poor food quality, inadequate staffing and other problems in jails and prisons serviced by Trinity.

The Public Safety and Justice Affairs committee on Wednesday postponed for two weeks its consideration of the $18.6 million five-year contract with Florida-based Trinity, which markets itself as a national leader in food service for jails and prisons.

In response to some of council's concerns, Trinity regional vice president of sales, Steve Sleigh, acknowledged the company was fined for a variety of issues at Michigan prisons, where Prison Legal News cited 2016 riots fed, in part, by poor food quality.

The contract was intended by the administration of County Executive Armond Budish as one of the fixes to the county's troubled jails, where food service was one of the problems cited by the U.S. Marshals Service in a November report describing "inhumane" conditions.

Council President Dan Brady on Wednesday said council "couldn't possibly" approve a contract with Trinity until council members receive an explanation for a "tide of complaints" leveled in news reports about Trinity.

Committee Chair Michael Gallagher told cleveland.com that council is acting with an "abundance of caution" and will determine whether to contract with Trinity after the company provides the county with written responses to allegations in the news reports.

"We're not just concerned with price," council member Yvonne Conwell said Wednesday. "We want quality."

Trinity was one of three bidders on the jail contract. Aramark Correctional Services submitted the lowest-priced quote, and Summit Food Service submitted the highest-priced quote, council was told.

In response to the Michigan reports, the company said the state entered into a subsequent contract with Trinity that makes clear the reports were "bogus and full of errors and a lack of circumstantiation." The circumstances in Michigan, Trinity said, were an inherited problem that took time to correct, and many of the violations took place before Trinity assumed control of food services.

Trinity also denied the company had any responsibility for riots at El Paso County Jail. And in Utah, Trinity said no maggots were found in inmates' food, and a manager was fired after food-temperature issues were brought to the company's attention,



A committee of the Cuyahoga County Council has postponed its consideration of a five-year contract for food service at the county jail. *Cory Shaffer, cleveland.com*

# Jail officers: Both returned to paid leave

**FROM A1**

guilty to a felony, the county or government agency has discretion on whether it wants to continue their employment, or put them on unpaid leave. If no action is taken, the county would pay Dugan about $8,500 and Evans about $10,000 from the time they pleaded guilty to the time their resignations become official at their Dec. 12 sentencing.

Cuyahoga County spokeswoman Mary Louise Madigan did not answer repeated questions about whether the county intends to place Dugan or Evans on unpaid leave.

Both were initially placed on paid leave March 27, five days after they attacked inmate Terrance Debose, according to county records. They were put on unpaid leave on April 9, the day after they were

indicted by special prosecutors with the Ohio Attorney General's Office.

On Aug. 5, both returned to paid leave retroactive to June 8, according to county records.

A county human resources specialist in May determined that it is the county's discretion on whether or not they can put employees on leave for two months when they're charged with felonies, according to county records.

Ohio Patrolmen's Benevolent Association corrections union filed a grievance with the county after Dugan and Evans were put on unpaid leave while other county officials — now-convicted former jail warden Eric Ivey and current Human Resources Director Douglas Dykes — kept getting paid despite also being charged with felonies.

Ivey was put on unpaid leave months after

his indictment and Dykes has never been put on leave. Dykes pleaded not guilty to a felony charge of theft-in-office and his case is pending.

Evans on March 22 wheeled Debose into a small isolated cell in the jail, turned off his body camera and punched Debose in the head six times, according to surveillance video of the incident and prosecutors. Dugan, who stood in the cell, punched Debose twice, the surveillance video shows.

Evans pleaded guilty to attempted felonious assault and tampering with evidence, both third-degree felonies. He faces between probation and six years in prison.

Dugan pleaded guilty to attempted abduction, a fourth-degree felony, and first-degree misdemeanor assault. He faces between probation and two years in prison.

CUYAHOGA COUNTY JAIL

# Inmate pepper-sprayed by officer on his release day, lawsuit says

**Adam Ferrise**  *aferrise@cleveland.com*

A former inmate at the Cuyahoga County Jail filed a lawsuit Tuesday that alleges that a jail officer pepper-sprayed him in the face on the day he was set to return home.

Chariell Glaze, 39, sued Cuyahoga County and jail officers Sgt. Damein Bodeker and Officer Masai Brown.

The lawsuit is the latest filed against the county over issues at the jail. Other suits include complaints about conditions that led to inmate deaths and allegations that officers attacked inmates.

Cuyahoga County spokeswoman Eliza Wing did not immediately respond to messages seeking comment, nor did United Auto Workers union spokesman Brian Rothenberg, who represents the jail officer's supervisors, and Ohio Patrolmen's Benevolent Association attorney Adam Chaloupka, who represents jail officers.

The lawsuit filed by civil rights attorney Ashlie Sletvold in Cuyahoga County Common Pleas Court was based in part on "snippets" of the officers' body camera video.

The incident at the heart of the allegations contained in the lawsuit happened on Nov. 27, 2017, the day Glaze was set for release from the jail after serving 35 days for violating the terms of his probation after he pleaded guilty to attempted carrying a concealed weapon and drug possession.

Glaze asked an officer early in the morning if the officer could check on the status of his release papers, according to the lawsuit. The officer said he'd leave a note for another officer scheduled to take his place on the next shift.

Glaze asked the new officer in the pod, Brown, who said he got the message and would ask officers in the booking and release area of the jail, according to police reports. Glaze's pod then went on forced lockdown, known as redzoning, according to the lawsuit.

He asked Brown again fearing he wouldn't get released because of the lockdown. Brown dismissed his second request, the lawsuit says.

Glaze asked to speak to a supervisor. Bodeker, who was a corporal at the time but has since been promoted to sergeant, showed up, the lawsuit says. Glaze showed him a judge's order that said Glaze was supposed to go home that day, according to the lawsuit.

Bodeker responded: "I should dump you and spray you right now," according to the lawsuit. Bodeker grabbed Glaze by the collar and "emptied" a can of pepper-spray on to Glaze's face, according to the lawsuit.

The lawsuit says Glaze did nothing to provoke the officer.

"It is inappropriate to deploy pepper spray on a person who is not resisting and posing no threat or to deploy pepper spray from a distance of less than 3 to 4 feet," the lawsuit says.

The pepper-spray left Glaze unable to see briefly and caused him to gasp for air, the lawsuit says. The two officers escorted Glaze down a hallway and walked Glaze into a metal door on purpose, the lawsuit says. Glaze hit his face and the impact broke a tooth and left him with cuts on his face and lips, according to the lawsuit.

Glaze showed him a judge's order that said Glaze was supposed to go home that day, according to the lawsuit.

Bodeker responded: "I should dump you and spray you right now," according to the lawsuit. Bodeker grabbed Glaze by the collar and "emptied" a can of pepper-spray on to Glaze's face, according to the lawsuit.

Brown reported the incident as an inmate-on-officer assault and called for the jail's Special Response Team.

Officers in that unit strapped Glaze to a restraint chair, mocked him and left him by in a room by himself for three hours, the lawsuit says. The officers did not wash the pepper-spray off Glaze's face, according to the lawsuit.

Glaze was placed in an isolated cell for three days, then moved to a different isolated cell specifically for inmates being punished, the lawsuit says. He was fed spoiled milk, an old orange and foul-smelling oatmeal, according to the lawsuit.

He was released from the jail on Dec. 7, 2017, which was 11 days after he was scheduled to go home. Glaze suffered from post-traumatic stress disorder after from the attack, according to the lawsuit.

Glaze filed a complaint with the jail after his release but never got a response from jail officials, according to the lawsuit.

Sletvold wrote in the lawsuit that county officials said that no surveillance videos of the incident exist, despite multiple cameras being positioned throughout the jail. She is accusing the county or jail officials of tampering with or altering the videos, the lawsuit says.

# Video shows jail supervisor pepper-spraying a restrained inmate

**Adam Ferrise** *aferrise@cleveland.com*

A Cuyahoga County jail supervisor charged with a second-degree felony was suspended for 15 days for pepper-spraying an inmate while she was strapped to a restraint chair.

The terms of Idris-Farid Clark's suspension came after the county released documents and the video in his disciplinary case as part of claim cleveland.com filed against the county in the Ohio Court of Claims.

The county spent months refusing to release the video and disciplinary records and did so after the start of mediation between the county and cleveland.com.

Glass' attorney, Subodh Chandra, called the video a "torture scene" in a statement to cleveland.com.

"They wanted to hurt her," Chandra said.

"This appeared to be a ritual of torture — something the officers were accustomed to doing and had practiced many times," Chandra's statement said.

County officials also twice released Clark's personnel file to cleveland.com while withholding the documents of his disciplinary case, once in February and again on March 15.

A spokeswoman for the county and spokesman for the sheriff's office have also repeatedly not answered questions, or said they did not know whether Clark was disciplined in the case.

**SEE JAIL VIDEO, A5**



In this image from video, Cuyahoga County Corrections Cpl., Idris-Farid Clark can be seen pepper-spraying an inmate that is strapped to a restraint chair.
*Cuyahoga County*

**Online:** To watch the full video, visit tinyurl.com/Jailvideo19

---

Lotteries, A2   Go & Do, A2   Metro, A3   Nation & World, A8   Deaths, A9   Forum, A10   Sports, B1   TV listings, B6
**Customer service:** To subscribe or report delivery issues, call 216-999-6000

 Scattered storms
68°/60°



EXHIBIT —

**COURTS** 8-30-19

# Jail officer arrested last week, now indicted

Adam Ferrise aferrise@cleveland.com

A Cuyahoga County Jail officer arrested last week on accusations that he tried to extort a co-worker into testifying on his behalf during his inmate-abuse case was indicted by a Cuyahoga County grand jury.

Cpl. Idris-Farid Clark, 32, is charged with two counts of extortion and one count of intimidation, all third-degree felonies.

A grand jury handed up the indictment Wednesday, the same day the grand jury also issued a separate indictment accusing two corrections officers of taking part in a drug-smuggling ring at the jail.

Clark already faced felonious assault and civil rights violation charges stemming from the July 16, 2018, attack and pepper-spraying of an inmate strapped to a restraint chair at the jail.

He is being held in the Geauga County Jail on $100,000 bond, but prosecutors have asked a judge to revoke his bond because of the new charges.

Clark on Aug. 7 sent a text message to an unnamed co-worker and told him that he received videos of "different incidents" at the jail that he said were "not good" or "just as bad as his," court records say.

Clark asked the other officer to testify on his behalf about the lack of training received by jail officers and "how the jail is ran," the affidavit says. Clark said he would release the videos if the officer refused to testify in his defense.

FBI agents and DeSimone on Wednesday put a recording device on the other officer's phone and had him call Clark, the records say.

Clark told the other officer to obtain other jail videos showing officers pepper-spraying inmates, the affidavit says. He also asked the officer to get the video from the county's computers and provide it to him. He said he would then destroy the videos once the officer testified for him, prosecutors said.

"I have videos available to me that could incriminate you if released," Clark told the officer on the call, the records say. "You'd be sitting in the same boat I'm in."

The video of the other officer included an incident where an inmate bit the officer, who used pepper-spray on the inmate, court records say. The officer was not accused of wrongdoing in that incident.

Clark also told the officer that he was "doing the same thing" with at least one other corrections officer, leading investigators to believe there are multiple victims.

He told the officer to ask other corrections officers to help Clark and provide videos for his defense.

Clark is also charged with felonious assault in the 2018 attack on inmate Chantelle Glass.



Cuyahoga County Corrections Cpl. Idris-Farid Clark is charged with felonious assault in connection with a July 16, 2018, incident in which he pepper-sprayed an inmate strapped to a restraint chair.
*Cuyahoga County*

EVIDENCE PROOF OF THE "NO SNITCHING" ZERO TOLERANCE "POLICY" LAW IMPOSED BY CUYAHOGA COUNTY GOVT. PERSONEL, COURTS, JUDGES, JAIL GUARDS, OFFICIALS.

# Guard had illegal copies of security videos

**Cory Shaffer** cshaffer@cleveland.com

A Cuyahoga County Jail supervisor possessed "bootleg copies" of jailhouse security videos that he used to threaten another corrections officer into testifying on his behalf, in a case in which he was charged with assaulting a restrained inmate, a prosecutor said in court Thursday.

Investigators found the videos as they executed a warrant at Cpl. Idris-Farid Clark's house, after he was recorded on a phone call telling a colleague that he had videos of a use-of-force incident in the jail that would implicate the officer in a crime if made public, special assistant prosecutor Matthew Meyer said.

Clark was free on a $5,000 bond on charges including felonious assault at the time of the phone call and declined to give investigators his source for the videos, Meyer said.

SEE JAIL VIDEOS, A8

# Jail videos

FROM A1

Clark was indicted in August on charges of intimidation and extortion related to the threats detailed in court records. But Thursday was the first time that prosecutors confirmed that Clark did in fact have the videos he cited on the recording, and that he was not simply bluffing.

"You cannot have public officials being extorted over the use of force or the video system," Meyer said at the hearing. "These charges are egregious."

The statements came at a pretrial hearing where a judge lowered Clark's bond from $100,000 to $50,000 on charges of extortion and intimidation related to the videos.

Common Pleas Court Judge Dick Ambrose ordered Clark to remain on home detention and have no contact with any employees of the Cuyahoga County Jail while his case is pending. Ambrose made an exception for Clark, who has been placed on unpaid leave since his arrest, to communicate with human resources officials at the jail about his employment status.

The revelation is the latest troubling detail to emerge about the way body and surveillance cameras from inside the jail were maintained by the Cuyahoga County Sheriff's Department as recently as last year.

FBI special agent Dennis Timony testified last week in the trial of two jail guards charged in connection with the February 2018 beating of an inmate that investigators uncovered incidents corrections officers deleted body camera videos from the sheriff's department's computers. Timony said the computer system the department used in 2018 was not secure and allowed anyone with access to the computer to delete videos, rename the files or extract them from the computer to an external device.

Meyer on Thursday echoed Timony's testimony that the sheriff's department's computer system was vulnerable.

"It's a system that is insecure inherently, but those videos should not have been in anyone's possession, much less been used to threaten other witnesses into doing what Mr. Clark wanted," Meyer said.

Timony testified that the department upgraded its body cameras and storage system after investigators became aware of the lax security. A county spokeswoman has provided cleveland.com with a copy of the department's body-camera policy put into place in April but has not answered several questions about the revelations.

Clark's lawyer, W. Scott Ramsey, said during Thursday's hearing that the allegations against his client are still just accusations and nothing has been proven in court.

Clark was indicted in April on charges of felonious assault, interfering with civil rights, unlawful restraint and tampering with evidence. Surveillance video captured him spraying inmate Chantelle Glass in the face with pepper foam while she was strapped into a restraint chair. Corrections officer Robert Marsh, who was seen punching Glass in the face, was also charged. Meyer said Thursday that Marsh has agreed to plead guilty, but refused to elaborate on the terms of the



**Cuyahoga County jail guard Idris-Farid Clark enters a courtroom Thursday with his hands and feet cuffed.** *Cory Shaffer, cleveland.com*

deal.

Clark on Aug. 7 sent a text message to an unnamed coworker at the jail and told him that he received videos of "different incidents" at the jail, including an incident where the officer sprayed pepper foam onto an inmate who bit him, according to an affidavit written by special investigator Robert DeSimone.

Clark said he would release the videos if the officer refused to testify in his defense about the lack of training given to jail officers and "how the jail is ran," the affidavit says. That line of defense is a commonly cited by law enforcement and corrections officers as a defense against accusations of excessive use of force.

FBI agents and DeSimone then put a recording device on the other officer's phone and had him call Clark, who repeated the threat and asked the officer to get more video from the county's computers and give it to him, records say. He said he would then destroy the videos once the officer testified on his behalf, prosecutors said.

"I have videos available to me that could incriminate you if released," Clark told the officer on the call, the records say. "You'd be sitting in the same boat I'm in."

Meyer also said during Thursday's court hearing that, while investigators were searching Clark's house, Clark told his cousin to find his cellphone and delete text messages that Clark had sent to a girlfriend, Meyer said.

# Metro

COURTS

## Cuyahoga County jail guard pleads guilty to assaulting inmate, will resign

**Cory Shaffer** *cshaffer@cleveland.com*

A Cuyahoga County jail guard on Monday pleaded guilty to punching a woman in the face while she was strapped into a restraint chair inside the jail.

Robert Marsh, who was captured on surveillance video beating Chantelle Glass on July 16, 2018, pleaded guilty to misdemeanor assault charge. He agreed to resign his position at the county and to testify at any other trial in the future involving incidents within the jail.

Prosecutors agreed to dismiss charges of interfering with civil rights and unlawful restraint as part of the plea agreement.

Cuyahoga County Common Pleas Court Judge Dick Ambrose accepted the plea, and set Marsh's sentencing hearing for Feb. 10.

Marsh is charged in the incident alongside Idris-Farid Clark, who also faces extortion and intimidation charges that accuse him of threatening to release bootlegged copies of jailhouse surveillance video of another officer using force on an inmate if that officer didn't testify favorably for Clark in the case involving Glass, according to court records.

Clark is scheduled to go to trial on Feb. 3.

The encounter was captured on the jail's surveillance videos. Clark did not turn on his body camera during the incident.

Clark pulled out his canister of pepper foam and shook it as he stood by and watched Marsh strap Glass into a restraint chair. Marsh struck Glass in the face after she extended her leg toward him, and she kicked him back. Clark stepped forward and sprayed the foam directly into Glass' face. He grabbed her hair and tilted her head back, and continued spraying her for several seconds.

Glass, who was originally arrested after a heated argument with her sister but then held in jail because she didn't show up to a previous hearing for a traffic ticket, has since sued Cuyahoga County, county officials, Clark and Marsh. Her case is pending in federal court in Cleveland.

The two guards are among several current and former jail employees and officials charged as part of an ongoing investigation by Ohio Attorney General David Yost.



Cuyahoga County corrections officer Robert Marsh pleaded guilty Monday to misdemeanor assault charge in the July 2018 beating of a restrained inmate in the jail. *Cory Shaffer, cleveland.com*

Former warden Eric Ivey resigned his post and was placed on probation last month after he pleaded guilty to obstructing an investigation into the August 2018 overdose death of inmate Joseph Arquillo, one of eight inmate deaths that year. Ivey, like Marsh, agreed to cooperate with prosecutors probing other cases in the jail and corruption in county government.

Cpl. Nicholas Evans and officer Timothy Dugan pleaded guilty Oct. 15 to felony charges that accused them of beating another restrained inmate after Evans flipped off his body camera. Both also agreed to resign from their jobs at the jail once they are sentenced on Dec. 12.

A jury partially acquitted two corrections officers Sept. 25 in a case where they were accused of attacking an inmate and purposefully blocking medical care after the attack. The jury was deadlocked on the most serious charges and a judge declared a mistrial. Prosecutors plan to pursue another trial in that case.

Cases against other former and current jail employees and officials remain pending, including against former jail director Ken Mills.

# New charges for guard accused of attacking restrained inmate

**Cory Shaffer** cshaffer@cleveland.com

A Cuyahoga County jail guard charged with attacking a restrained inmate and threatening a fellow jail guard was charged Wednesday in a new indictment that accuses him of illegally accessing jailhouse body camera videos.

A grand jury charged Cpl. Idris-Farid Clark with tampering with records and unauthorized use of a computer, both felonies.

He's also charged with felonious assault, intimidation and extortion in the July 2018 abuse of inmate Chantelle Glass and a subsequent attempt to get a fellow jail guard to testify in his favor, prosecutors said.

Wednesday's charges come after the Ohio Attorney General's Office said in court last month that Clark possessed "bootleg copies" of body camera videos that showed other corrections officers using force on inmates inside the jail.

Investigators found the videos as they executed a warrant at Clark's house after he was recorded on an Aug. 7 phone call telling a colleague that he had videos of a use-of-force incident in the jail that would implicate the officer in a crime if made public, special assistant prosecutor Matthew Meyer said at the Sept. 26 court hearing.

Clark was indicted in April on charges of felonious assault, interfering with civil rights, unlawful restraint and tampering with evidence in the incident involving Glass. Surveillance video captured him spraying pepper foam into the woman's face as she sat strapped into a restraint chair. Corrections officer Robert Marsh, who was seen on the video punching Glass, was also charged in the incident.

He has agreed to plead guilty, but officials have refused to disclose details of his deal.

Clark did not turn on his body camera during the incident.

---

# Jail director indicted on new charges

## Mills accused of making jail unsafe during string of inmate deaths

**Adam Ferrise** aferrise@cleveland.com

Former Cuyahoga County jail director Kenneth Mills was charged Wednesday and accused of making the jail unsafe during a period of time when seven inmates died.

A Cuyahoga County grand jury handed up an indictment charging Mills with two second-degree misdemeanor counts of dereliction of duty.

He remains charged in connection with a May 22 month.

---

## Indicted

FROM A1

Mills' attorney, Kevin Spellacy, did not immediately return a message seeking comment.

It's the first criminal charge that encompassed the entire jail operation at a time when inmates died at a historic rate. Others are charged in connection with inmate beatings, extortion, drug-dealing to inmates and ignoring a dying inmate. A trial for two of them ended in a hung jury in connection with an inmate beating.

Former jail warden Eric Ivey pleaded guilty to ordering officers to turn off their body cameras while they investigated an inmate death. He was sentenced to one year on probation and to cooperate with Ohio Attorney General prosecutors and the FBI, which is assisting the attorney general and conducting a civil-rights probe of the jail.

Mills' tenure as jail director began with controversy. He was hired as the jail director without any experience in corrections. Cuyahoga County Executive Armond Budish, when he took office in 2015. He also paid Mills $120,000, well above the $80,000-$95,000 salary the county advertised.

Budish put Mills in charge of the project to regionalize the county's jails. Mills cut bas[...] costs for inmates at a time when the coun[...] took on housing all of Cleveland police[...] arrests, with the city of Cleveland payi[...] the county for each inmate. The plan wa[...] designed to make bring in more money f[...] the county.

The crush of new inmates was too mu[...] for the already struggling jail to handl[...] Inmates died one after the other starting [...] June, some from drug overdoses and som[...] from suicides.

Mills was initially charged with lyin[...] to council during a May 22, 2018 meetin[...] weeks before the first inmate died.

Mills told council members during th[...] meeting that he was unsure why the ja[...] didn't have enough nurses. Then-medica[...] director Gary Brack told the council Mill[...] obstructed the hiring of nurses.

Mills later lied to federal and count[...] investigators about his communication[...] with a "high-level Cuyahoga County off[...] cial," according to county prosecutors[...] Prosecutors have not identified that officia[...]

Mills was charged with tampering wit[...] evidence, a third-degree felony, and tw[...] misdemeanor counts of falsification. H[...] pleaded not guilty to those charges.

---

### Jury acquits man who hit his attorney in the face

A jury on Tuesday acquitted a man who sucker-punched his defense attorney in the face during a February court hearing where he was sentenced to 47 years in prison.

David Chislton, 42, applauded jurors who found him not guilty of felonious assault as they walked out of the courtroom after delivering the verdict Tuesday.

He then hooted as Cuyahoga County sheriff's deputies led him out of the courtroom and back to jail.

The charge stemmed from when Chislton — handcuffed and in orange — sucker-punched his former defense attorney Aaron Brockler on Feb. 19, after Common Pleas Court Judge Nancy Margaret Russo sentenced Chislton to 47 years in prison on felonious assault and aggravated arson charges.

The case seemed open-and-shut to prosecutors. The attack happened in open court, was captured on a deputy's body camera video and was witnessed by a roomful of attorneys. Medical records showed Brockler suffered two hairline fractures of his nose and a sprained MCL that he still showed symptoms of months later.

# ...arges for guard accused
## ...king restrained inmate

...ffer@cleveland.com

...ounty jail guard charged ...restrained inmate and ...w jail guard was charged ...w indictment that accuses ...essing jailhouse body cam-

...urged Cpl. Idris-Farid Clark ...ith records and unautho- ...uter, both felonies. ...ed with felonious assault, ...hantelle Glass and a subse- ...et a fellow jail guard to tes- ...osecutors said.

...arges come after the Ohio ...s Office said in court last ...ossessed "bootleg copies" ...eos that showed other cor- ...ing force on inmates inside

...nd the videos as they exe-

cuted a warrant at Clark's house after he was recorded on an Aug. 7 phone call telling a colleague that he had videos of a use-of-force incident in the jail that would implicate the officer in a crime if made public, special assistant prosecutor Matthew Meyer said at the Sept. 26 court hearing.

Clark was indicted in April on charges of felonious assault, interfering with civil rights, unlawful restraint and tampering with evidence in the incident involving Glass. Surveillance video captured him spraying pepper foam into the woman's face as she sat strapped into a restraint chair. Corrections officer Robert Marsh, who was seen on the video punching Glass, was also charged in the incident.

He has agreed to plead guilty, but officials have refused to disclose details of his deal.

Clark did not turn on his body camera during the incident.

# Jail director indicted on new charges

## Mills accused of making jail unsafe during string of inmate deaths

Adam Ferrise aferrise@cleveland.com

Former Cuyahoga County Jail director Kenneth Mills was charged Wednesday and accused of making the jail unsafe during a period of time when seven inmates died.

A Cuyahoga County grand jury handed up an indictment charging Mills with two second-degree misdemeanor counts of dereliction of duty.

He remains charged in connection with a May 22 Cuyahoga County Council committee meeting where he is accused of lying to council in an attempt to block the hiring of nurses at jail.

Seven inmates died at the jail between June and October. Two other inmates died in ensuing months.

Mills resigned a week ahead of a November U.S. Marshals Service report that found "inhumane" conditions for inmates, including a lack of healthcare, poor food quality and officers withholding food as punishment.

Mills is one of 11 current and former jail employees that have been charged in an Ohio Attorney General's Office criminal probe of the jail.

The indictment says Mills negligently failed to effectively manage the jail during as director from January 2017 through Nov. 14, 2018.

He is also accused of negligently failing to provide inmates with adequate food, bedding shelter and medical care, the indictment says.

SEE INDICTED, A5

...d

Kevin Spellacy, did not ...urn a message seeking

...minal charge that encom- ...jail operation at a time ...d at a historic rate. Others ...nection with inmate beat- ...ug-dealing to inmates and ...mate. A trial for two of the ...ry in connection with an

...rden Eric Ivey pleaded ...officers to turn off their ...ile they investigated an ...was sentenced to one year ...to cooperate with Ohio ...prosecutors and the FBI, ...the attorney general and ...rights probe of the jail. ...s jail director began with ...as hired as the jail direc- ...xperience in corrections. ...Executive Armond Bud- ...office in 2015. He also paid ...well above the $80,000- ...county advertised

regionalize the county's jails. Mills cut basic costs for inmates at a time when the county took on housing all of Cleveland police's arrests, with the city of Cleveland paying the county for each inmate. The plan was designed to make bring in more money for the county.

The crush of new inmates was too much for the already struggling jail to handle. Inmates died one after the other starting in June, some from drug overdoses and some from suicides.

Mills was initially charged with lying to council during a May 22, 2018 meeting, weeks before the first inmate died.

Mills told council members during that meeting that he was unsure why the jail didn't have enough nurses. Then-medical director Gary Brack told the council Mills obstructed the hiring of nurses.

Mills later lied to federal and county investigators about his communications with a "high-level Cuyahoga County official," according to county prosecutors. Prosecutors have not identified that official.

Mills was charged with tampering with evidence, a third-degree felony, and two misdemeanor counts of falsification. He

month.

## Jury acquits man who hit his attorney in the face

A jury on Tuesday acquitted a man who sucker-punched his defense attorney in the face during a February court hearing where he was sentenced to 47 years in prison.

David Chislton, 42, applauded jurors who found him not guilty of felonious assault as they walked out of the courtroom after delivering the verdict Tuesday.

He then hooted as Cuyahoga County sheriff's deputies led him out of the courtroom and back to jail.

The charge stemmed from when Chislton — handcuffed and in orange — sucker-punched his former defense attorney Aaron Brockler on Feb. 19, after Common Pleas Court Judge Nancy Margaret Russo sentenced Chislton to 47 years in prison on felonious assault and aggravated arson charges.

The case seemed open-and-shut to prosecutors. The attack happened in open court, was captured on a deputy's body camera video and was witnessed by a roomful of attorneys. Medical records showed Brockler suffered two bruises

# Syrian bor

...leted their pullout.

...d and Ras al-Ayn. ...senior Kurdish official, Redu ...ed his forces had entirely le ...he said Turkish troops an ...continuing military operati ...ern Syria outside that withdr ...he Kurdish-led forces notifi ...use of the completed withdr ...a senior Trump administra ...l, speaking on condition of a ...cuss the contents of the lette ...After the U.S. announced its ...this month, Turkey launc ...n, saying it wanted to car ...e cleared of Kurdish fight ...nsiders terrorists. Turkey als ...many of the 3.6 million Sy ...its soil in that zone, which ...d of Syria's Kurdish minorit ...For the Kurds, a Turkish ta ...an the crushing of the self-r ...rved out in the northeast am ...r. They also fear massive ...ange as Kurdish civilians flee

## CUYAHOGA COUNTY JAIL

# Grand juries subpoena medical records

**Courtney Astolfi** *castolfi@cleveland.com*

MetroHealth System on Wednesday released subpoenas from federal and Cuyahoga County grand juries seeking medical records related to the deaths or injuries of inmates in the troubled county jails.

A federal grand jury served a subpoena late last year seeking documents related to inmate injuries and deaths dating eight years back, when MetroHealth first contracted with the county as a health-care provider at the jails.

The subpoena signals that federal authorities are looking into a broad scope of the jails' treatment of inmates spanning several years.

Eight inmates died last year, and a ninth inmate died this year.

MetroHealth spokeswoman Tina Shaerban Arundel told cleveland.com on Wednesday that the hospital interpreted the subpoenas as requiring records from 2011 onward. Those records included:

› Reviews and autopsy reports for all inmates who died in county custody or at the jail.

› Any emails, memos, directives or other correspondence exchanged by leadership or other people about the deaths, or about any of the inmates who died, or five other inmates that prosecutors identified by name. (The named inmates include six who died in 2018, as well as five others, including one whom guards are accused of beating and then blocking from medical care.)

› Any files, notes or other records about the deaths or injuries of the inmates.

› MetroHealth also was required to turn over records related to "medical care provided as a consequence or suspected consequence of interactions/altercations with staff" or "injuries from unknown origins." Those records included:

› Medical records and notes, treatments provided, and complaints from or on behalf of inmates.

› Investigative records, including surveillance and body camera footage, that was provided to MetroHealth to aid in a diagnosis or determination of the cause of injury or death.

› All communications related to jail policies or practices on the use-of-force by jail staff, and the inmates "resultant access to medical treatment."

› All inmate grievances related to physical altercations with staff.

› All inmate grievances related to the quality, accessibility or denial of medical care.

Assistant U.S. Attorney Justin Seabury Gould, whose name is on both the December and March subpoenas, is one of two federal prosecutors overseeing a review of the findings the U.S. Marshals Service reported last November.

Among other problems, the Marshal's Service reported "inhumane" and "unconstitutional" treatment of inmates.

# Jail

FROM A1

months and hopes to hire more.

"Obviously, that's not acceptable to any of us," Madigan said in response to the images. "We will identify and discipline them."

The issue is among a myriad of problems at the jail, including mistreatment of inmates, low morale among the understaffed jail officer roster, officers beating inmates and selling them drugs and several inmates being mistakenly released from the jail, including a man accused of murder.

Nine inmates died of either drug overdoses or suicide in less than a year's time beginning in 2018, spurring a damning U.S. Marshal's report that called the jail's conditions inhumane, several civil lawsuits and a criminal investigation that has led to indictments of several corrections officers and the jail's former top brass.

One photograph shows a guard appearing to sleep with his head in his hands next to an inmate who is not wearing handcuffs or any other restraints. The attorney said there was no other jail guard around.

Another video shows the attorney's client holding a folder of paperwork about his case in a contact visitation room enclosed by glass, looking out at a different guard who also appears to be asleep. The guard is slumped back in the chair behind the desk on the other side of the glass. His head sways back as his chest swells on the inhale, and then sways back forward as he exhales.

The guards are the only ones who can unlock the visitation rooms.

The attorney said the defendant banged on the window several times to try to wake up the guard, but he never did. Nearly half an hour passed before another guard came by, noticed his colleague was asleep and woke him.

The attorney stressed even though the defendant was charged with murder, he has been nothing but respectful in previous interactions and the attorney was not concerned in that particular instance.

"If he's banging on the window and the guy didn't wake up, what else could someone else do without him waking up," the attorney said.

Ohio Police Benevolent Association attorney Adam Chaloupka said it was unacceptable to sleep on the job. But he pointed out that the union has filed grievances accusing the department of violating overtime rules laid out in the collective bargaining contract.

Chaloupka said the department forces officers to work 16-hour days on consecutive days and more than twice a week, which he said is explicitly barred in the contract.

"If we had better staffing and if management adhered to the contract terms on how they should hit mandatory overtime, then the likelihood of this happening would decrease," Chaloupka said.

He said corrections officers are human beings with lives outside of work, and the union will defend the guards if they face internal discipline over the images.

"The system is set up for them to fail," Chaloupka said.

CUYAHOGA COUNTY JAIL

## Photo, video show sleeping guards, attorneys say

Cory Shaffer  cshaffer@cleveland.com

A photograph and a video provided to cleveland.com show two different guards at the Cuyahoga County Jail sleeping during attorney visitations in recent months.

One of the jail guards fell asleep at a table as four inmates, all unrestrained, sat next to him, according to the defense lawyer who captured the images and shared them with cleveland. com. Another guard fell asleep as the attorney was locked in the contact visitation room with a defendant charged with murder.

The lawyer, who wishes to remain anonymous to avoid any potential ramifications against the clients the attorney represents, made it clear in a phone interview with cleveland.com that the images represent widespread issues plaguing the jail, which has been plagued by staffing shortages and long hours for guards.

"I don't fault them individually," the attor-

ney said of the two officers. "I fault the jail as a whole."

Cuyahoga County Public Defender Mark Stanton, who on Monday blasted the jail's handling of the attorney visitation process, agreed with that assessment in a brief phone interview Friday.

The images were not symptoms of the guards being disinterested or not wanting to do their jobs, Stanton said.

"They're underpaid, they're completely overworked and stressed to the limit," Stanton said. "They bust their rear ends for us."

County spokeswoman Mary Louise Madigan declined to discuss the attorney's assertions about the wider issues in the jail except to say that the county has hired a record number of corrections officers in recent

SEE JAIL, A8

> **"I don't fault them individually. I fault the jail as a whole."**
>
> *An attorney who was locked in the contact visitation room with a defendant charged with murder when the guard fell asleep*

November 2, 2019
Cleveland Plain Dealer News
(Front Page)

CUYAHOGA COUNTY

# Pinkney refuses to answer jail questions

**Courtney Astolfi** *castolfi@cleveland.com*

Cuyahoga County Sheriff Pinkney incensed County Council members on Tuesday by refusing to answer dozens of questions posed in advance about the troubled jails he oversees.

Pinkney, who is scheduled to retire on Aug. 2 and was appearing before council's Public Safety Committee for the first time this year about the jail, allowed his private attorney, Richard Blake of McDonald Hopkins, to largely speak on his behalf.

Pinkney had been called before the committee to answer questions about conditions at the jails, where eight inmates died last year and a ninth died in January, and how the administration of County Executive Armond Budish made decisions about jail operations.

Council sent Pinkney 53 questions in advance. Blake said he advised Pinkney not to answer them because Blake believed Pinkney's responses could cause a "potential negative impact" on criminal investigations and civil lawsuits.

Blake later said that it was not an appropriate time for Pinkney to answer questions, mainly due to the ongoing criminal probe of county government. Three county officials, including the former jail director, Ken Mills, are indicted in the probe. Several of council's questions were about Mills. Blake said he does not believe Pinkney is a target of the probe.

Pinkney has been subpoenaed to testify to the grand jury overseeing the probe, and could be called to testify as a witness if Mills' case goes to trial. Budish is also on the witness list; his personal attorney Larry Zukerman attended Tuesday's hearing.

Pinkney is also named as a defendant in several civil lawsuits against the county over jail conditions.

Here are some of the unedited questions from the council's Public Safety Committee provided to Pinkney in advance of the meeting.

**JAIL STAFFING**
> What direct control did you have over staffing, staffing decisions, requests for additional unbudgeted staffing at all levels of the Sheriff's Office since you became the Sheriff? Who has the final decision on hiring, firing, promoting etc. within the Sheriff's Office? Were any of your staffing decisions overridden, overturned, or denied by someone? If so who denied your staffing decisions and for what position?
> There have been some horrific videos released of correction officers beating and pepper spraying inmates that are restrained. What can be done to eliminate this type of abuse from tax payer funded employees and what have you done personally to try and ensure this doesn't happen ever again?
> Do you believe there is ever an appropriate time for a Jail Official or Law Enforcement Officer to shut off his or her body camera? If so, why?

**OVERCROWDING/PHYSICAL STRUCTURE OF THE JAIL**
> What best practices would you like to see incorporated into rehabbing the existing jail or building a new one?
> How many inmates are in the County jail awaiting trial? Out of those number of inmates, what is their average number of days in the jail?

**U.S. MARSHALS REPORT & STATE INSPECTIONS**
> In the US Marshals report, it states that pregnant women are sleeping on the floor. Was this accurate? If it is, how did we let this happen?
> In the US Marshals report, there was discussion of doors that don't lock. Was this accurate? If it is, how did we let this happen?
> In the US Marshals report, there was discussion of access to food being used as a punitive measure. Was this accurate? If it is, how did we let this happen?
> In the US Marshals report, there was discussion about inmates being denied access to showers, proper hygiene products, etc. due to red zoning. Was this accurate? If it is, how did we let this happen?
> In the US Marshals report, it states that juveniles are being co-located with adult inmates. Was this accurate? If it is, how did we let this happen?
> What are your thoughts on the State of Ohio coming in every 30 days to inspect the Jail?
> What are your thoughts on why the U.S. Marshals Report was so dramatically different from the preceding State of Ohio Inspection Reports? How could those inspections have missed what the Marshals found?

# Analysis

FROM A1

**November 2017:** In meeting with cleveland.com, Budish along with his chief of staff, law director and HR chief adamantly argued that the internal auditor was wrong, that the overtime payments to salaried employees were legal and that the county charter allowed the administration to make changes in compensation policy without County Council approval.

**November 2017:** The Cuyahoga County prosecutor investigated the overtime payments to salaried employees and concluded the payments were illegal and that the administration's legal arguments to the contrary were flawed.

**February 2018:** An Ohio judge ordered the county to release body-camera footage of a jail guard who attacked a naked female inmate in 2016, ruling the county's months-long effort to withhold the video from cleveland.com violated Ohio's public records law.

**April 2018:** The county's Department of Public Works failed to get approval from County Council before paying nearly $62,000 in rent and utilities for some office space. Two council members also accused the department of unfairly withholding the rent payments for 13 months in an effort to coerce the landlord into extending the lease on the office space.

**August 2018:** Budish's administration refused to make public a draft of an internal audit report about the IT Department that contained information about the ongoing county corruption probe. Cleveland.com was leaked a copy weeks later. The administration turned over its copy once it learned cleveland.com had obtained the document.

**October 2018:** State investigators found fail-

rett being killed by her mother and mother's boyfriend. Investigators disclosed that Aniya had told social workers months earlier that "mommy" hurt her, and that the department ignored two years of injuries reported by the girl's day care provider.

**December 2018:** The Ohio auditor concluded that the Budish administration illegally awarded $63,000 in incentives to eight county employees, including a $15,000 bonus to a high-ranking official. The audit of the county's 2017 finances also found the county paid another 10 employees $4,532 that they had not earned.

**February 2019:** Budish's staff provided cleveland.com with a copy of a letter Budish wrote to County Council about jail health care, but the copy was missing two key paragraphs contained in the version received by council members. A spokeswoman said the administration had "inadvertently" provided cleveland.com with a draft of the letter before the "final, official, formal" version was created.

**March 2019:** Then-interim Law Director Nora Hurley provided cleveland.com with an incomplete list of keywords being used to narrow the scope of a subpoena from corruption investigators demanding emails from several of Budish's top officials. Hurley later gave conflicting reasons why some terms were omitted and waited days to release emails showing all the terms.

**March 2019:** The county reported its oft-delayed computer-integration project is delayed again, this time for as long as six months, and few dollars are left in the project's $25 million budget. County Council first approved the so-called ERP project in October 2016.

**March 2019:** County Inspector General

his office access to employee emails. The Budish administration responded by ordering the access granted by March 11. Griffin said the department granted him access to the emails eight days after the March 11 deadline had expired.

**March 2019:** Budish ordered the firing of a newly hired HR manager after cleveland.com inquired about her conviction four months earlier on a first-degree misdemeanor charge of inducing panic. The county's HR chief had known about the conviction when he hired the manager. But a spokeswoman said Budish disagreed with the HR chief's decision.

**April 2019:** Emails obtained by cleveland.com show that medical officials at the county jails had pleaded with Budish's administration to make changes aimed, in part, at preventing inmate suicides. The calls for reform went unanswered. When an inmate died by suicide in December, county officials made the changes within a day.

**April 2019:** The Sheriff's Department forgot about a deadline to renew its lease of the Euclid Jail, leaving the facility to operate without a lease for eight days. "The deadline came quickly and wasn't on the radar, unfortunately," County Public Safety and Justice Chief Brandy Carney said at the time.

**April 2019:** The administration refused to identify the finalists for the job of jail director, despite cleveland.com having sought the resumes of the two finalists through a public records request three weeks earlier. A spokeswoman cited the ongoing hiring process as an explanation for why the county had failed to comply with the records request, and said taking three weeks to release the resumes meets

# Excusable mistakes or bad county governance?

**Courtney Astolfi** castolfi@cleveland.com

Cuyahoga County Executive Armond Budish's administration has for years attributed its gaffes and bad decisions, both large and small, to innocent mistakes.

In some other instances, such as when the administration paid overtime to salaried employees, Budish and his administrators erroneously maintained they had done nothing wrong.

Today, cleveland.com looks back 17 months at some of those moments in light of the latest incident, which involved the administration providing a TV station with a video of a jail inmate being beaten after having denied the same video to cleveland.com.

Are these innocent mistakes, evidence of incompetence or worse? You be the judge:

**November 2017:** Cuyahoga County's independent auditor reported that the Budish administration violated the county charter by paying $1.7 million in overtime to salaried employees who were prohibited from receiving extra pay. The auditor reported that payroll staff overrode a control that had ensured exempt employees could not enter overtime on their time sheets.

SEE ANALYSIS, A12

EXHIBIT-

**CUYAHOGA COUNTY**

# Judge says Juvenile Center needs more guards, psychiatric nurse to improve safety

**Courtney Astolfi** *castolfi@clevleand.com*

More money needs to be included in the county budget to hire detentions officers, a psychiatric nurse and others to improve safety at the Cuyahoga County Juvenile Justice Center, the administrative judge told council this week.

The administration of County Executive Armond Budish denied the juvenile court's requests in its proposed 2020-21 budget, Administrative Judge Kristin Sweeney said Monday during budget hearings.

County Council has not approved the budget and is still considering what changes, if any, to make.

"The budget hearings are for department leaders to present their needs and request, and that's what Judge Sweeney did yesterday. We heard her, Council heard her, and the requests are being considered in this very tight budget," county spokeswoman Mary Louise Madigan told cleveland.com.

The juvenile court wants to hire 10 detention officers, a psychiatric nurse, and two human resources employees. The annual costs for such personnel, along with a one-time payment for on-site access to medical records, would cost about $3.5 million, Sweeney told cleveland.com.

Current staffing levels at the detention center comply with Ohio law, Sweeney said, but not with federal standards related to the Prison Rape Elimination Act and standards governing the Juvenile Detention Alternatives Initiative.

The latter is a criminal justice reform program aimed in part at improving conditions in juvenile facilities.

Ohio's Department of Youth Services requires Cuyahoga and 13 other counties to participate.

Ten additional guards would bring the Cuyahoga County Juvenile Justice Center in compliance with both programs, Sweeney said.

A psychiatric nurse, Sweeney said, is needed to tend to the 50% to 70% of detention center residents that take medication. The nurse would ensure children properly take their medication and monitor their behavior.

The goal is to reduce the risk of children becoming violent or harming themselves, Sweeney said.

Two additional human resources workers



would be used to speed the hiring, conduct background checks for applicants, reduce overtime costs, and curtail "inappropriate" call-offs from detention officers demonstrating a pattern of calling in sick or using unplanned vacation time.

Sweeney told council that some problems at the Juvenile Justice Center are similar to recent problems at the county jail, such as a high rate of turnover among detention officers and excessive call-offs that result in overtime payments.

Too few staff members also prevent the Juvenile Justice Center from implementing policies recommended in a 2018 report by the Center for Children's Law and Policy, such as a program meant to encourage good behavior, Sweeney said.

The report, compiled by six juvenile justice experts who visited the facility, found staff shortages and the use of overtime hinder "the ability to supervise youth in a safe and humane manner."

"We're not just coming to you asking because we think this is a nice idea — there's serious safety concerns with some of this stuff," Sweeney said.

"We really want these kids to be safe. ... I want our detention staff to not worry about being assaulted."

**Cuyahoga County juvenile court wants to hire 10 detention officers, a psychiatric nurse, and two human resources employees for the Juvenile Justice Center to comply with federal standards.**
*Associated Press*

EXHIBIT –

## CUYAHOGA COUNTY

# Thomas O'Malley to return as juvenile court's administrative judge

## Veteran jurist previously held position from 2008 to 2013

**Cory Shaffer** *cshaffer@cleveland.com*

Veteran Cuyahoga County juvenile court Judge Thomas F. O'Malley will return to the position as administrative judge for a two-year term beginning in 2020.

O'Malley's colleagues on the bench elected him on Thursday to take over for Judge Kristin W. Sweeney, who held the administrative judge position since 2014.

O'Malley, who is not related to Cuyahoga County Prosecutor Michael O'Malley, was the court's administrative judge from 2008 to 2013. He led the court's partnerships with other county agencies to create the Youth and Family Community Partnership to place more juveniles in local residential facilities rather than ship them to state-run facilities out of Northeast Ohio.

He also led the court when it signed onto the Annie E. Casey Foundation's Juvenile Detention Alternatives Initiative. During the same time, state legislators reformed the way juveniles are charged as adults after hundreds of teenagers were being sent to adult courts.

He was also at the helm of the court when it moved into the new facility on Quincy Avenue. The project was roundly criticized as being behind schedule and over budget, and the court had to cut ties with several contractors who were later swept up in the countywide corruption scandal.

O'Malley takes over the court at a time when the number of children being bound over to adult court has skyrocketed back to the levels before the reforms.

He will assume his new duties on January 1, 2020, for a 2 year term that concludes December 2021.

In a news release announcing the vote, O'Malley thanked Sweeney for the work she had done, which he said has led to a more efficient and transparent court. He also thanked the court's employees.

**O'Malley takes over the court at a time when the number of children being bound over to adult court has skyrocketed back to the levels before the reforms.**

NOVEMBER 2, 2019 (CLEVELAND) PLAIN DEALER NEWS

# DAILY Legal News

*Official Court Journal*
Est. 1885

Vol. 132 No. 244     Friday, December 6, 2019     Sixty-five Cents

EXHIBIT -

## Families of inmates describe violent conditions to panel

**By KIM CHANDLER**
Associated Press

MONTGOMERY, Ala. (AP) — Family members and advocates of Alabama inmates crowded into a state task force meeting Wednesday to plead for changes to the state's criminal justice system and in state prisons that have come under national scrutiny for violent and crowded conditions.

The Governor's Study Group on Criminal Justice heard from family members, attorneys and advocacy groups at the meeting. Speakers urged an overhaul of conditions, medical care and current sentencing laws and described their fears for loved ones who are incarcerated.

Sandy Ray showed the panel a photo of the battered face of her son, Steven Davis, who died in October after an altercation with corrections officers at William E. Donaldson Correctional Facility where he was incarcerated after a murder conviction.

In a news conference before the meeting, Ray said she has gotten no information from the state prison system about what happened to her son and described the agonizing moment he was removed from life support at a hospital.

"This is my son," Ray said as she held his photo. "He is beaten beyond recognition. I had to have a closed casket because of what they had done to him. No one, not even a dog, deserves this." Ray said.

The Department of Corrections said in an October news release that it is investigating Davis' death after officers used "physical measures" on Davis whom they said rushed officers with makeshift weapon. Corrections Commissioner Jeff Dunn said after the meeting that her son's death remains under investigation.

Ten inmates were killed in inmate-on-inmate homicides in a 10-month period between October 2018 and August 2019, according to statistics from the state prison system.

The Alabamians for Fair Justice Coalition, a coalition of advocacy groups, at the news conference placed signs on empty chairs with the names of 21 inmates they said died in state prisons in the last year from homicides, suicides and drug overdoses.

Alabama Gov. Kay Ivey created the study commission after the Department of Justice threatened to sue Alabama over unconstitutional prison conditions. The U.S. Department of Justice in April issued scathing findings that condemned Alabama prisons for what it called unconstitutional conditions, including high rates of violence and inmate homicides.

Former Alabama Chief Justice Sue Bell Cobb told the panel that the state system continues to be plagued by violence, drugs and corruption behind bars.

"DOC has got to come forward with some bold steps," Cobb said, noting the high number of inmate deaths and the number of officers who have been arrested. "People are leaving Alabama prisons and they are more addicted today than when they entered our prisons."

Diyawn Caldwell told the panel her husband is incarcerated at a prison that the state has allowed to "descend into chaos and violence."

"Every single time there is a report of a stabbing, my heart stops," Caldwell said.

A mother confronted the state prison chief after the meeting, saying her son was beaten by two officers while incarcerated.

"I don't want to bury my child. She buried hers," Jennifer Cullers told Dunn as she pointed to Ray.

Dunn told reporters after the meeting that the state has acknowledged its problems in prisons. He said the state, which faces a court order to add as many as 2,000 officers, is working to add staff. He said more "boots on the ground" is the top step the state can take to reduce prison violence.

"This is going to take a long time to fix. There are no quick fixes here, unfortunately. It is going to take a long sustained effort," Dunn told reporters.

*THE DEATHS IN OHIO PRISONS AND JAILS TWICE AS WORSE NOW!! RICHLAND R.I.C.I. PRISON; 6 DEAD IN LAST 100 DAYS! 20 DEAD IN PAST 20 MONTHS! CUYAHOGA COUNTY JAIL; 10 DEAD IN 10 MONTHS! (2018 - 2019) 6 OF THOSE DEAD OCCURED IN ONLY 90 DAYS! STATE WIDE 100'S ARE DEAD & MURDERED MONTHLY!! GUARD BEATINGS & TORTURES ARE 5 X HIGHER IN OHIO!!*

# Budget

FROM A1

"I think that overall this bill will be very good for the state of Ohio," said Senate President Larry Obhof, a Medina Republican. "In many ways, the governor's version of the bill, the House version and the Senate version all had some different issues, but focused on the big-picture level, the same kinds of things."

State Rep. Jack Cera, a Belmont County Democrat, was the lone dissenting vote, with Trumbull County Sen. Sean O'Brien, a Democrat, joining the panel's four Republicans in voting yes.

Cera told reporters he was disappointed that the bill largely preserves the business-tax deduction after both chambers had voted to trim it. His comments suggest other Democrats, which largely backed the House bill after helping elect Republican Larry Householder as speaker, may vote against the final product.

"What I didn't understand is how we could go from both the House and Senate really addressing it to where we just go back to existing law, and that creates a problem for our caucus," Cera said.

The budget deal will keep the first $250,000 of income for limited liability corporations and other business entities tax-free, as well as keep an existing 3% flat rate on income above that. That outcome generally is a win for business groups — and a loss for Democrats and others who favored rolling back the deduction — since the House version of the budget had lowered the threshold to $100,000, with the Senate favoring keeping the $250,000 level. Both chambers had called for replacing the flat 3% tax with Ohio's higher individual rate. But the tax will remain largely intact.

However, legislators are developing language that would make lobbyists and lawyers ineligible for the deduction. This change is meant to address one of the primary complaints with the tax deduction — that individuals can form businesses without hiring any employees, undermining the argument that the deduction creates jobs. The fiscal impact of the change is unknown, lawmakers said, since it's new.

The budget bill would keep high-school graduation requirements introduced by the Senate, including "diploma seals," meant to shift emphasis away from standardized testing. It also places a one-year moratorium on academic distress commissions, a compromise between the House and Senate budget plans, that lasts through Oct. 1, 2020.

The deal also compromises between the House and Senate plans on school funding. It keeps a $38.5 million increase the Senate wanted for high-growth schools, as well as the $625 million over two years in "wraparound" support services for rural schools backed by the House. The Senate and DeWine had proposed spending an extra $550 million over two years on "wraparound" support services, including after-school programs and counseling, for at-risk students. But the basic school-funding formula remains unchanged.

The deal calls for a single pharmacy benefit manager — a proposal backed by the House — to negotiate prescription-drug purchases on behalf of Medicaid, the state and federally run health insurance program for the poor and disabled.

The budget finalizes March 17, 2020 as the date of the 2020 primary election. That sets up a conflict with St. Patrick's Day and Cleveland's massive parade that day. Cleveland-area officials unsuccessfully sought to change the election date, saying the parade conflict will dampen turnout and create logistical issues with holding the election.

Budget negotiations previously had broken down, causing lawmakers to blow a June 30 legal deadline for the first time in a decade and pass a 17-day temporary budget instead. DeWine, after largely staying out of budget talks, ended up proposing removing all tax policy from the budget to try to break the stalemate.

Talks proceeded slowly last week, leading House Speaker Larry Householder to suggest a second temporary budget may be needed, particularly staking out rolling back the business-income tax in private negotiations.

But talks progressed rapidly over the weekend — a development that coincided with the advancement of a bill designed to bail out two Ohio nuclear plants. Asked how the House ended up moving so much on the business tax, Canton Rep. Scott Oelslager, the GOP House finance chairman who played a key role in tax policy negotiations said: "The budget process as you all know is a compromise process. So you have to negotiate the best you can."

Obhof told reporters he expects the Senate will approve its version of the nuclear bill on Wednesday, likely setting up future negotiations to reconcile differences with a version previously approved by the House.

*CLEVELAND, COM NEWS*
*CLEVELAND PLAIN DEALER NEWS*
*JULY 17, 2019*

COMMON PLEAS COURT

# Judge begrudgingly declares man wrongfully imprisoned

Cory Shaffer  *cshaffer@cleveland.com*

A Cleveland man whose 1995 murder conviction was overturned after a court found that prosecutors withheld evidence during his trial has officially been deemed wrongfully imprisoned.

Common Pleas Court Judge Daniel Gaul held in his six-page opinion handed down Thursday that Anthony Lemons fit a new state law that loosened the definition of a wrongfully imprisoned person. But Gaul made it clear that he was not happy that he had to make such a finding.

"Although the Court may not fully agree with the outcome in this matter, it is bound by and will diligently follow the law and legal precedent," Gaul wrote in the order.

Gaul's ruling marks what could be the final step in a five-year legal battle for Lemons to clear his name and seek damages from the Ohio Court of Claims for the 18 years he spent behind bars.

Lemons, in a phone interview during a break at his job at King Nut in Solon, thanked each of the attorneys that worked on his case: Sara Gedeon, Al Gerhardstein, David Malik and Kevin Spellacy.

"Today is a blessing," Lemons said. "It's a life-changing moment."

Lemons received a life sentence after he was convicted in 1995 of killing Eric B. Sims based largely on a witness' identification of him as the shooter. The witness identified Lemons from a police lineup based on a pair of Nike sneakers he was wearing. The witness said the shooter was wearing the same shoes at the time of the killing.

During an appeal of his sentence, lawyers discovered that Cleveland police possessed a report from Nike before the trial that said the type of sneakers the witness said Lemons was wearing were not released until after the killing. Another report discussed other potential suspects in the shooting, but neither report was turned over to Lemons' defense attorneys.

The conviction was overturned in 2012 and prosecutors eventually dropped the charges against Lemons instead of seeking a new trial.

Gaul initially ruled against Lemons' request to be declared wrongfully imprisoned and actually innocent. The 8th District Court of Appeals overturned Gaul's decision and found Lemons to be wrongfully imprisoned in 2017, but upheld Gaul's denial of his claim for actual innocence.

State lawmakers in 2018 passed a bill that made eligible for compensation wrongfully imprisoned people whose convictions have been overturned due to evidence being withheld at their trial.

Gaul cited the 8th District's opinion in his ruling Thursday, and said he would not "disturb the criminal court order" and overturn another judge's determination that Lemons was wrongfully imprisoned.

Lemons' attorneys said in a joint statement that they are thrilled with Gaul's decision.

"Not a shred of forensic evidence ever tied him to the murder of Eric Sims and his identification as a suspect was



Anthony Lemons hugs one of his attorneys, Sara Gedeon, in Cuyahoga County Common Pleas Court in December 2014, after he was acquitted of murder charges dating back to 1994.  *Marvin Fong, The Plain Dealer*

> "Although the Court may not fully agree with the outcome in this matter, it is bound by and will diligently follow the law and legal precedent."
>
> *Common Pleas Court Judge Daniel Gaul*

tainted by evidence withheld by the Cuyahoga County Prosecutor," the statement read. "Justice can now finally be served."

Cuyahoga County Prosecutor Michael O'Malley's office said Gaul was right to express reservations in his ruling and called the outcome "a miscarriage of justice" that could put taxpayers on the hook for as much as $3 million.

"Today's decision is evidence that the legislature needs to revisit this law. No other state has similar legislation," O'Malley's office said in a statement.

"Paying millions of dollars to people who fail to show their innocence is an injustice."

Lemons said he was glad to have hopes the ruling will allow him to work with other wrongfully imprisoned men he served alongside in prison to form a re-entry program.

# Ruiz v. Estelle, 679 F.2d 1115
# United States Court of Appeals for the Fifth Circuit

June 23, 1982

Nos. 81-2224, 81-2380, 81-2390

The state has an "obligation to provide medical care for those whom it is punishing by incarceration." 155Link to the text of the note "(Acts) or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs" of inmates constitute cruel and unusual punishment. 156Link to the text of the note [**84] Neither inadvertent failure to provide adequate medical care, 157Link to the text of the note nor carelessness, 158Link to the text of the note nor even deliberate failure to conform to the standards suggested by experts is cruel and unusual punishment. The Constitution does not command that inmates be given the kind of medical attention that judges would wish to have for themselves, nor the therapy that Medicare and Medicaid provide for the aged or the needy. 159Link to the text of the note It prohibits only "deliberate indifference to serious medical needs". 160Link to the text of the note

[**85] HUH is not an accredited hospital. It is outmoded and inadequate. 161Link to the text of the note [**86] There [*1150] was testimony that the effects of inadequate physical facilities are aggravated by deficiencies in sanitation and infection control; the number of physicians is inadequate; and TDC improperly relies on inmate medical assistants, who lack adequate training, for medical care. Inmate assistants have amputated fingers, set bones, applied casts, sutured wounds, repaired Achilles' tendons, given injections, administered medications, and kept records. Inmates, in many instances lacking adequate training, also serve as laboratory technicians, X-ray technicians, physical therapists, respiratory therapists, first aid attendants, and medical records clerks. Many of the inmates assigned to these tasks are uneducated and some are illiterate. The district court found "numerous" instances of "(grievous) neglect of the personal care of patients at the HUH," 162Link to the text of the note but nothing in the findings indicates either that these are imminent in the hospital or that they are not remediable by a larger and better-trained staff.

JCAH standards are applied to hospitals in Texas by THA. Although HUH does not meet these standards, the record establishes that no prison hospital in any other state does. Some Federal Bureau of Prisons hospitals meet them but others do not. Of the 7,000 private hospitals in the United States, only 3,000 meet JCAH standards adequately for full accreditation and an additional 1,000 are on probation or one-year accreditation; the other 3,000 are not accredited because they do not meet the standards. Literally millions of persons receiving private medical care are being treated in hospitals that do not meet the requirements imposed by the district court's decree.

Expert standards are a useful guide but they are not a constitutional measure. 163Link to the text of the note Restricting use of HUH to Huntsville inmates and permitting it to render only infirmary care do not solve the medical care problem. Moreover, there have been additional developments since the district court issued its decree. By orders dated October 19, 1981, and November 5, 1981, the district court stayed

[**87] the provision of its decree pertaining to HUH. In its October 19 order, the district court directed TDC to file a formal response to particular suggestions made by the plaintiffs concerning HUH. TDC filed this response. In the court's November 5 order, TDC's response is described as exhibiting "a commendable air of conciliation." That order further directs the parties to meet and discuss possible agreement on continued operation of HUH.

Accordingly, we vacate the provision of the district court's decree pertaining to the HUH and remand that issue to the district court for further proceedings consistent with this opinion after the district court has received a report concerning the results of the discussion it has ordered. Should the district court consider injunctive relief still necessary, its order shall [**88] not command the closing of HUH or restrict its use solely to Huntsville inmates. The order should instead be limited to requiring that TDC provide the minimum level of hospital care required by the Constitution.

This relief is set forth in full in the Appendix to our opinion in Ruiz VI, 666 F.2d at 862-73, and summarized in Ruiz V, 650 F.2d at 559-64. However, we here again outline its principal features, as they relate to overcrowding 123Link to the text of the note and security.

[**62] 6.41 Overcrowding

a. Maximum Population: Effective November 1, 1981.

By November 1, 1981, TDC had to reduce its overall inmate population to a figure [*1143] equal to twice the number of general population cells, plus the number of inmates who could be housed in dormitories that afford forty square feet (excluding bathing, toilet, and activity areas) per inmate. TDC may not thereafter, until further order of the court, accept any inmate whose confinement would cause the inmate population to exceed that figure. 124Link to the text of the note

b. Maximum Population: Effective November 1, 1982.

By November 1, 1982, TDC must reduce its overall inmate population to a figure equal to 1.5 times the number of general population cells, plus the number of inmates who can be housed in dormitories that afford sixty square feet (excluding bathing, toilet, and activity areas) per inmate. TDC may not thereafter, until further order of the court, accept any inmate whose confinement would cause the inmate population to exceed [**63] that figure. 125Link to the text of the note

c. Maximum Population: Effective November 1, 1983.

By November 1, 1983, TDC must reduce its overall inmate population to a number equal to the number of general population cells, plus the number of inmates who can be housed in dormitories that afford sixty square feet (excluding bathing, toilet, and activity areas) per inmate. TDC may not thereafter, until further order of the court, accept any inmate whose confinement would cause the inmate population to exceed that figure. 126Link to the text of the note

d. Double-Celling.

By August 1, 1982, no more than 50% of TDC's inmate population housed in cells may be assigned to cells of sixty square feet or less holding two inmates. By [**64] August 1, 1983, no inmate may be assigned with another inmate to a cell containing sixty square feet or less. 127Link to the text of the note

e. Dormitories.

Beginning November 1, 1981, TDC could not confine any inmate to a dormitory providing less than forty square feet (excluding bathing, toilet, and activity areas) per inmate. By November 1, 1982, TDC may not confine any inmate to a dormitory providing less than sixty square feet (excluding bathing, toilet, and activity areas) per inmate. 128Link to the text of the note

We turn to the dormitory space limitation. Neither sixty square feet, nor forty square feet, nor any other measure is constitutionally ordained. Yet the facts found serve as adequate basis to require more space for inmates confined in dormitories, not only to ameliorate living conditions but, more important, to enhance security and reduce violence. An inmate in a cell with one other person is exposed to assault only by that person; an inmate in an overcrowded dormitory having an inadequate security staff may be victimized by many. Moreover, a forty-square-feet-per-inmate dormitory space requirement will not occasion vast expense. At present, TDC is, by use of tents, providing forty square feet for most dormitory inmates. 150Link to the text of the note Only 128 inmates are confined in dormitories that [*1148] house more than they would if there were forty square feet per inmate.

# Missouri Sheriff Tells Judge that County Won't Pay for Prisoners' Food, Medical Care

### by Bill Barton

IN APRIL 2019, CLAY COUNTY SHERIFF Paul Vescovo sued the Missouri county's three-member commission, claiming that it slashed his operating budget by over 40 percent "in retaliation for a criminal referral made two years ago."

That referral involved assistant county administrator Laurie Portwood, who was accused of directing a subordinate to tamper with public records by removing the name of Presiding Commissioner Jerry Nolte. Sheriff Vescovo passed the investigation of the allegation to the Missouri Highway Patrol. Portwood, the county's top budget official, then entered into a deferred-prosecution agreement to resolve the criminal investigation. She retained her job and later received a salary increase from $107,000 to $140,000 annually.

Meanwhile, the sheriff's department ran out of money to pay contractors that provide food and medical services to some 300 prisoners at the county jail.

Vescovo requested $2.8 million in 2018 to fund the jail and administrative costs but received only $1.79 million upon a recommendation by Portwood, down from $2.58 million received in 2017 when the sheriff had requested $3 million.

When Vescovo's lawsuit went to trial in August 2019, Portwood struggled to defend her budget recommendation to state Circuit Court Judge Darren Adkins. The county's other two commissioners, Luann Ridgeway and Gene Owen – who voted to approve the reduced budget for the sheriff's department – did not testify. The litigation drew an expression of regret from Nolte, Vescovo's lone ally on the county commission.

"Like many citizens, I am frustrated by the enormous drain on county taxpayers' money over such a large volume of litigation on issues like the state audit and others," Nolte said.

Clay County citizens collected more than 9,000 signatures on a petition to have the local government audited. After the signatures were verified, State Auditor Nicole Galloway's office attempted to conduct a performance audit, but was forced to seek court orders to obtain financial and meeting records from the county. Audit officials cited

an "unprecedented level of obstruction."

Often the lone dissenter in 2-1 votes on the three-member county commission – whose "reputation for dysfunction and political backbiting" was decried in an August 20, 2019 editorial by the *Kansas City Star* – Nolte deemed the sheriff's 2019 budget too low and voted against it.

"I believe many of the actions taken by the County Commission are not in the best interest of the people we serve," he declared. His attorney, Jerry Reddoch, added that "the system in this county is in need of some help."

In August 2019, Judge Adkins agreed that the underfunding of the sheriff's department was deliberate, finding Port-

wood's testimony "was at best not credible." He ordered the county commissioners to provide Vescovo with nearly $1 million in additional funding to cover operational expenses through the end of the year.

In another 2-1 vote that sidelined Nolte, the county commission voted in September 2019 to appeal the judge's ruling. Through an attorney, both Ridgeway and Owen ridiculed Vescovo's lawsuit as "expensive and unnecessary," but justified their appeal by asserting the effort "will cost less than 5% of the legal expenses" incurred in defending against the suit.

Sources: *kansascity.com, fox4kc.com, excelsiorspringsstandard.com*

# Three Deaths in Three Days at Illinois Prison Spur Calls for Greater Transparency

### by Chad Marks

IN SEPTEMBER 2018, THREE PRISONERS died on three consecutive days at the Menard Correctional Center in Illinois. Kevin Curtis, 31, who was on suicide watch, died on September 5. The next day, Edwin Freeman, 45, also on suicide watch, was found unresponsive in his cell and taken to a hospital, where he was pronounced dead. And on September 7, prisoner Timothy Murray, 32, died due to "probable intoxication with an unknown substance," according to the coroner.

An internal investigation by the Department of Corrections (DOC) said its employees had committed no wrongdoing in connection with the deaths, despite the fact that one guard, Nickolas Mitchell, admitted he falsified cell checks during the time that Curtis died. One staff member was temporarily suspended by the DOC in connection with the deaths, according to a spokesperson.

WBEZ obtained records that indicated at least 166 prisoners had died in DOC facilities from January 2017 to September 2018. In about 80 of those deaths, the prison system's research department listed no reason for the cause of death. When requests

were made regarding specific deaths, the DOC said in some cases it had no death certificates or reports.

This lack of transparency makes it easy for prison officials to conceal any misconduct or negligence. Family members of the three prisoners who died in September 2018 said they received few details about the deaths of their loved ones.

The "Department of Corrections acts in private, behind locked doors – that's the whole point of the Department of Corrections," said Alan Mills, an attorney with the Uptown People's Law Center.

Illinois lawmakers failed to pass a bill (HB3090) that would have required state prisons and local jails to provide family members and the Attorney General with details about prisoner deaths, and to conduct investigations and issue annual reports. The DOC, in conjunction with the Illinois Sheriffs' Association, had opposed the legislation.

Lawmakers and advocates say they have plans to reintroduce a similar bill. Illinois Governor J.B. Pritzker initially refused to say whether he would support legislation requiring greater transparency

# $3.1 Million Settlement for Washington Jail Detainee's Death
## *"Will You Get Back Up?"*

*by Douglas Ankney*

In November 2017, Piper Travis was arrested for failure to appear on two misdemeanor counts of stealing a TV and a $3.48 bag of Easter candy at a Walmart in Washington state. On November 20 the 34-year-old from Whidbey Island was booked into the Snohomish County jail to await trial. On the first day of December she was observed lying on the floor of her cell, foaming at the mouth. Around two weeks later she lost brain activity. Then she died.

When she was two, Travis survived a car crash that killed her mother and older sister. Doctors said a head injury sustained in the accident likely contributed to her later development of bipolar disorder. She was taken in by her aunt, Paulette Beck, who along with her husband raised Travis as their own.

Travis wrote poetry in her adolescence as an emotional outlet. At the alternative high school she attended, she won six scholarships for her writing skills. But timed tests proved too challenging as a result of her bipolar disorder, so she never earned a degree from the community college she attended nor a license after completing cosmetology school.

Instead, Travis managed to get by on Social Security and groceries from a local food bank, where she regularly volunteered "to give something back." Her friend, Karmen Chastain, described Travis as a bright, bubbly and engaging woman – "just a beautiful mess" – who was "attentive to people's needs" and had a "sixth sense about when somebody just needed some quiet or a sympathetic ear."

But after a few days in jail, Travis was no longer bright or bubbly. According to a lawsuit filed by the Becks, on November 28, 2017, a deputy noticed Travis in her cell, crying from what she described as a "terrible headache."

She then began refusing meals, moaning and screaming in pain. Deputies told her to "quiet down." Because she was making strange noises and was "very slow to process instructions," they punished her by taking away her recreation time. Her condition worsened until she was, according to one deputy, "removing her clothing, smearing feces on herself, shaking, breathing fast, and yelling incoherently."

"She looked like she was in pain, but since she wasn't talking, I really did not know where she stood," the deputy added.

Unable to walk, Travis was eventually taken by wheelchair to an observation unit. After continuing to refuse meals and foaming at the mouth, a nurse called an Emergency Medical Technician (EMT) for a psychological evaluation.

According to the lawsuit, jail staff told responding EMTs that Travis was "faking it." But the emergency responders discovered she had a fever of 102 and observed seizure activity, and immediately transported her to a hospital.

Doctors there diagnosed sepsis, pneumococcal meningitis and acute respiratory distress. The EMTs attributed "possible neglect" as the cause for Travis' condition. She was placed in a medically induced coma. When doctors observed she showed no signs of brain activity, the Becks allowed her to be removed from life support, and she died on December 16, 2017.

The program from Travis' funeral displayed lines from a poem she wrote when she was 18: "Posing for pictures, as the poster child for the rebellious teen, will leave you spinning and kidding around and around, so just remember ... in the end we all fall down.... Will you get back up?"

The county settled the Becks' wrongful death suit for $3.1 million in September 2019, while admitting no wrongdoing in exchange for the family's agreement to drop the case. The payout was at least the fourth made in just eight years over deaths at the Snohomish County jail. See: *Beck v. Snohomish County*, U.S.D.C. (W.D. Wash.), Case No. 2:18-cv-01827.

In the other cases, the family of Marilyn Mowan received a $675,000 settlement for the 62-year-old's 2014 death after she ingested a lethal quantity of water; the estate of Michael Saffioti was paid $2.3 million after the 22-year-old went into anaphylactic shock due to a food allergy and died in 2012 [see: *PLN*, Jan. 2016, p.54]; and most of a $1.3 million settlement went to the minor son of Lyndsey E. Lason, 27, following her death from a lung infection in 2011. [See: *PLN*, Jan. 2016, p.36].

In 2015, the Sheriff's Office implemented reforms including increased staffing and screening by a nurse during the booking process. No deaths were reported in 2015 or 2016, earning a commendation from Governor Jay Inslee when he toured the jail – prematurely, according to attorney Cheryl Snow, who represented the Becks.

"When you look at this case, you can't help but scratch your head and think: You have somebody coming in on a minor misdemeanor charge who dies in your care," she said. 

Sources: *kuow.org, heraldnet.com*

## The LITT Group, LLC
*Executive Clemency and Pardon Experts*

Sentence reduction and other sentence modification through executive clemency or a pardon.

Please contact our offices or have a family member contact our offices:

The LITT Group, LLC
106 Lakeridge Dr.
Stephens City, VA 22655
www.LITTfreedom.com
littfreedom@gmail.com
917-940-8055

*Serving inmates in all fifty states as well as federal inmates.*

*Unsolicited documents not returned.*
*Not a pro bono group.*

## LifeTimes
*Finding Life's Joys in the Face of Adversity*

A lifestyle magazine for anyone on a public registry, and those who support them!

*At this time, we are unable to offer discounted rates*

Don't Miss A Single Issue
Subscribe Today!

$35/year
(4 issues)

LifetimesMagazine.org
or call 877-848-5141
PO Box 453, DeKalb, IL 60115

# Seventh Circuit: Failure to Provide Medical Accommodation is Deliberate Indifference

*by Kevin Bliss*

THE SEVENTH CIRCUIT COURT OF Appeals held in a June 26, 2019 ruling that sufficient evidence existed for a reasonable juror to conclude that prisoner LeRoy Palmer's congenital deformity constituted a serious medical condition, and that a prison medical employee's knowledge of the heightened risk of harm and failure to prevent that harm qualified as deliberate indifference.

Palmer was born without his left hand, with his arm terminating at the wrist. When he was transferred on January 11, 2012 to the North Reception and Classification Center in Illinois for an upcoming court appearance, he underwent routine intake screening by Craig Franz.

Palmer stated that he told Franz, employed by private contractor Wexford Health Sources, of his condition and need to have a low bunk pass similar to the one he had at his previous facility, the Shawnee Correctional Center. He said Franz failed to issue the pass, and he was assigned to a top bunk.

Palmer then filed two requests to see the prison's doctor, both of which were ignored. On January 22, 2012, he fell from the top bunk and seriously injured his knee.

He filed suit against Franz in U.S. District Court, alleging negligence and deliberate indifference. After the close of discovery Franz moved for and was granted summary judgment. He claimed Palmer grew up with his deformity and it did not classify as a serious medical need, that Palmer did not show Franz was aware of his medical needs and that Palmer failed to prove deliberate indifference.

Palmer appealed, and the Seventh Circuit held that his risk of injury was obvious; simply because he was born with the deformity did not mean he had adapted to it and did not need accommodation.

The Court of Appeals said the district court had erred in assessing credibility to testimony that Franz could not issue a low bunk pass as a basis for granting summary judgment. It was sufficient for Palmer to submit evidence to the contrary for the case to be decided by a jury. Further, evidence suggested that Franz was aware of the heightened risk due to Palmer's medical condition and acted with deliberate indifference by declining to take steps to mitigate that risk. The case was reversed and remanded, and remains pending. See: *Palmer v. Franz*, 928 F.3d 560 (7th Cir. 2019).

# Louisiana Enters into Subscription Model Contract for HCV Treatment

### by David M. Reutter

IN JUNE 2019, LOUISIANA OFFICIALS entered into a contract that will allow prisoners and Medicaid patients to receive advanced medications to treat hepatitis C (HCV). The five-year contract with Asegua Therapies, a subsidiary of Gilead Sciences, aims to treat at least 31,000 of the state's 39,000 HCV-positive residents by 2024 – a ten-fold increase over current treatment levels.

"This partnership will have a direct and immediate impact on the most vulnerable populations with hepatitis C – people who are on Medicaid or who receive care through the state corrections system. These populations are disproportionately affected by hepatitis C and often face the greatest difficulty in accessing care," said Gregg Alton, Chief Patient Officer at Gilead Sciences.

Because HCV infections are easily spread by sexual contact and sharing needles, the disease poses a health risk to the rest of the population. About 3.4 million Americans carry the virus, which can cause liver inflammation and immune-response liver damage, though 70 to 80 percent of carriers have no symptoms.

In 2018, Louisiana treated only 384 patients with Asegua Therapies' HCV drug Epclusa, one of a new class of medications called Direct Acting Antivirals (DAAs). The drug increases the effectiveness of HCV treatment from 50 percent to 95 percent, but at a price per patient of $10,000 – still significantly less than when it was first introduced in 2014.

Lawsuits filed in 2018 and early 2019 by Louisiana state prisoners Richard Henderson, Tony Cormier and Level Doughty alleged the failure to treat them with DAAs was an "egregious act" that put them at risk of liver failure. The three men are housed in a medical unit at the Elayn Hunt Correctional Center.

The trio of lawsuits claimed the refusal of prison officials to administer the latest DAA drugs was due to their cost, amounting to a policy of 'let them die' that reportedly contributed to the deaths of 15 state prisoners between 2014 and 2016.

"The guys that didn't file suit died waiting for the state to do the right thing," said plaintiff's attorney Joseph Long.

"We've never refused medical treatment or care because of cost," insisted Jimmy LeBlanc, secretary of the Louisiana Department of Corrections (DOC).

In fact no one actually dies from HCV, noted DOC spokesman Ken Pastorick, but complications attributed to the disease claim the lives of more Americans each year than all other infectious diseases combined.

Baton Rouge Nurse Practitioner Elizabeth Britton said her unincarcerated Medicaid patients began receiving DAAs in 2014, but prisoners at the Elayn Hunt facility did not start getting the new drugs until 2017. Even then, another 10 Louisiana prisoners died due to complications from HCV in 2017 and 2018.

Because the state was paying for DAA treatments on a per-patient basis – at a total cost of nearly $60 million annually – the price to treat all state residents with HCV, including prisoners, was estimated at $760 million. The state's new contract with Asegua Therapies is based on a "subscription model" that allows Louisiana to pay a flat annual fee of $58 million – equal to its current spending on DAAs – for unlimited HCV treatment. Over the five-year agreement, the state's costs will be capped at $290 million.

"We knew we had to do better," said Governor John Bel Edwards when signing the contract with Asegua Therapies.

"We are committed to supporting efforts to eliminate hepatitis C in communities around the world and are excited to partner with the visionary leaders in Louisiana to make this public health opportunity a reality in this state," added Alton.

HCV treatment for Louisiana residents under the state's new subscription arrangement began on July 15, 2019.

· Sources: *Associated Press, The Advocate, modelhealthcare.com, ldh.la.gov, mavyret. com, gilead.com*

# Victim Notification Law Plagues Alabama's Parole System

### by Kevin Bliss

ADMITTING IT IS AN "UNCALLED-FOR-situation," Alabama Bureau of Pardons and Paroles (BPP) Director Charles Graddick announced on September 9, 2019 that all future parole hearings were being postponed in order to comply with a new law that took effect the first of that month. The law, signed in June by Governor Kay Ivey, requires notice to victims 30 days prior to a prisoner's pardon or parole hearing.

The new statute followed the July 2018 murders of seven-year-old Colton Lee and his great grandmother, Marie Martin, as well as Martin's neighbor, Martha Reliford, by Alabama parolee Jimmy Spencer. Though Spencer's previous victims had been notified of his parole hearings in 2008 and 2013, they were not notified of the one that sent him to a Birmingham halfway house in January 2018, from which he walked away three weeks later. The police arrested him on drug charges in June 2018 but he was released after his parole officer failed to respond to their inquiries.

When the notification statute took effect on September 1, 2019, Governor Ivey appointed Graddick, a former Mobile Circuit Court judge, as the BPP's new director. Even though he was known as "lock 'em up Charlie" due to his tough-on-crime reputation while on the bench, Ivey promised that Graddick would be "fair-minded." After placing Cook, Norman and Johnson

Former BPP Director Eddie Cook had opposed the new law, which tightens restrictions on the agency and creates additional oversight. Cook and two subordinates were placed on leave while state officials investigated allegations of "malfeasance," including inappropriate solicitation of state employees through e-mail to take a stance against the law. Cook and Assistant Executive Director Chris Norman are reportedly using saved leave time to reach retirement and will not return to work. BPP Personnel Director Belinda Johnson, who was also placed on leave, is awaiting a hearing to determine her employment future.

22

# Judge Orders Federal Prisoner with Cancer Released Due to Poor Medical Care

## by Matt Clarke

In June 2019, a U.S. District Court ordered that a prisoner held at the Federal Correctional Institution in Aliceville, Alabama be released due to the poor medical care she received from the Bureau of Prisons (BOP) for invasive breast cancer.

In 2013, Angela Michelle Beck, 47, pleaded guilty to conspiracy to distribute methamphetamine and possession of a firearm in connection with a drug trafficking offense. She was one of 21 people indicted on charges of being part of a large-scale methamphetamine ring, and received a 166-month sentence. She had served over six years.

According to court documents, Beck found a lump in her left breast while taking a shower in September 2017. She reported the lump to prison officials and was seen by a doctor on October 16, 2017, then by a surgeon two months later. She had a mammogram on December 21, 2017 that showed multiple breast masses and cysts. A prison doctor ordered a biopsy.

Eight months later, the biopsy confirmed Stage II cancer and Beck was told she would need to have the breast removed. That didn't happen for another three months. It took five more months before she received a follow-up appointment with an oncologist for further treatment.

By then it was too late for chemotherapy, and she had found two lumps in her right breast.

Attorneys Robert Elliot of Winston-Salem and James B. Craven III of Durham helped Beck apply for compassionate release under the provisions of the First Step Act. On June 28, 2019, U.S. District Court Judge Catherine Eagles issued a 29-page order reducing Beck's sentence to time served and granting compassionate release.

Judge Eagles gave BOP officials 21 days to evaluate Beck's residence and implement a five-year period of supervised probation. In her order, Eagles said she had granted compassionate release due to Beck's "invasive cancer and the abysmal health care [that the] Bureau of Prisons has provided," which qualified "as 'extraordinary and compelling reasons' warranting a reduction in her sentence to time served.".

"With appropriate supervision, the court concludes that Ms. Beck 'is not a danger to the safety of any other person or to the community,'" Judge Eagles wrote. "Ms. Beck poses little risk of recidivism or danger to the community.... As such, Ms. Beck is entitled to compassionate release."

BOP officials did not deny any of the allegations in Beck's request for compassionate release or provide an explanation for the delay in her medical care. However, they did argue, unsuccessfully, that she did not qualify for compassionate release because she didn't have a terminal disease or a debilitating medical condition that prevented her from taking care of herself, and that she may still "present a danger to the community given the seriousness of her offenses."

Beck had previously filed a lawsuit seeking an order requiring the BOP to provide treatment for her cancer. In that case, which was also heard by Judge Eagles, prison officials were ordered to ensure that Beck received immediate medical care. In granting compassionate release, Eagles noted that the BOP "continues to justify delays by blaming non-BOP officials, such as her oncologist, and logistical issues, and it has provided erroneous information about her recent appointments to the Court. The quality of Ms. Beck's cancer treatment at [the BOP] in the past remains the best predictor of what it will be in the future." See: *United States v. Beck*, U.S.D.C. (M.D. NC), Case No. 1:13-cr-00186-6-CCE; 2019 U.S. Dist. LEXIS 108542.

Additional source: *journalnow.com*

# Pattern of Abuse and Mismanagement at North Carolina Jail

## *by David M. Reutter*

The sheriff's office in Cherokee County, North Carolina lost five veteran deputies to abrupt firings and resignations in just two months following an October 2018 news report that described allegations of staged fights between prisoners in a crude form of "jailhouse justice." In December, two former deputies were indicted for assaulting a detainee at the Cherokee County jail. Another high-profile dismissal in March 2019 followed a probe by the State Bureau of Investigation (SBI), which was the third time the sheriff's office had been investigated since Sheriff Derrick Palmer's election in 2014.

The most recent investigation began in December 2018, when former guards Wesley "Gage" Killian and Joshua Gunter were indicted on misdemeanor assault charges for an altercation with prisoner George Victor Stokes, which occurred at the jail in May 2018. Stokes, who was handcuffed, was allegedly shocked with a stun gun by Gunter and then kicked in the head by Killian. Both deputies were fired later that month.

Claims depicting a pattern of detainee abuse were verified by Joseph Preston Allen, who retired as a sergeant in March 2018 after 11 years at the jail, and by Tom Taylor, a veteran guard of seven years who quit in August 2018. Both said inexperienced jailers encouraged prisoners to fight each other using a practice called "pop the locks," in which a detainee's cell was opened so other prisoners could attack him.

Allen pointed to the March 14, 2018 attack on detainee Corey Hall, who "got the piss beat out of him" by other prisoners. Over a six-week period, Hall was moved out of the medical wing four times but returned within days. Allen protested to Chief Deputy Mark Thigpen and the jail administrator, Captain Mark Patterson, citing a policy that gives newly arrived prisoners a chance to alert guards to possible issues with other prisoners in the unit they are assigned to, but his concerns were disregarded.

"Captain [Patterson] told me, 'This is jail, they might as well get used to it,'" Allen said.

The death of Joshua Shane Long after he was booked into the facility on drug charges on July 11, 2018 was also addressed in the SBI investigation. Long was acting erratically and seen consuming a pill upon his arrest. He was taken to the jail and placed in an observation cell; about five hours later he collapsed, and efforts to revive him failed.

"If he ingested something, he shouldn't have even been in that jail," Allen said. "I would have sent him to the Murphy Medical Center."

However, Thigpen first spent around 45 minutes calling court personnel to get Long's bond unsecured before finally having him transported by helicopter to a Tennessee hospital, where he was pronounced dead. In November 2018, the SBI turned over its investigation to District Attorney Ashley Welch, whose office is still completing its review.

Another incident at the jail involved prisoner Steven Hall, who was chained to a floor drain while naked. Thigpen claimed Hall was out of control and harming himself, but jail policy requires a detainee to be placed in a restraint chair and a nurse to be called in such situations, Taylor said. Cherokee County deputies dressed Hall in a jail uniform from the neighboring Graham County Detention Center, then dropped him off at that facility.

After the SBI investigation, Chief Deputy Thigpen was fired from his $54,000-a-year job in March 2019 – reportedly for allowing his wife, Libby, to make personal use of a Sheriff's Office cell phone. Libby Thigpen, a former deputy, was fired in December 2018 after resisting a transfer to the county's Department of Social Services (DSS), where Sheriff Palmer's wife, Cindy, is a former director and current business officer. DSS has also been the subject of a recent SBI inquiry.

By the time Thigpen left, Patterson had already retired as jail administrator after learning he was being demoted. Three other veteran jailers – Lt. Tom Beasley, Lt. Sally Lawson and Lt. Jeremy Bresch – quit or were forced to resign around the same time. ◼

Source: *carolinapublicpress.org*

# Conditions Lawsuit Against Indiana County Jail Certified as a Class Action

### by Kevin Bliss

AN INDIANA FEDERAL DISTRICT COURT held that a former jail detainee, Adam Bell, had presented sufficient evidence to allow certification of a class comprised of all persons currently confined, and who will be confined in the future, at the Henry County Jail. The ruling came in a lawsuit against the Sheriff's Department that alleged unconstitutional and inhumane conditions of confinement.

Represented by the Civil Liberties Union of Indiana and attorney Joel E. Harvey, Bell filed suit while housed at the jail, saying it was originally designed to hold 76 prisoners but officials began adding additional bunks and mattresses to cells without required authorization, expanding the capacity to 116 prisoners.

Bell said the facility had been deemed overcrowded 100% of the time by the chief jail inspector of the Department of Corrections. Prisoners were forced to sleep on cell floors, in offices, in indoor recreation areas and near toilets. He also alleged that the jail was constantly understaffed which, with the overcrowded conditions, led to assaults and other violent incidents.

Henry County acknowledged the claims of additional beds but denied other allegations in the complaint. The county said the jail did not have more prisoners than permanent bunks, and denied claims that jail staff would not supply prisoners with proper grievance forms and refused to hear grievances except on approved forms.

Bell asked that the district court certify the case as a class action. Henry County responded that Bell did not qualify as class representative because he was no longer held at the jail and therefore could not fairly protect the interests of the class.

U.S. District Court Judge Sarah Evans Barker held the U.S. Supreme Court had ruled in *Sosna v. Iowa*, 419 U.S. 393 (1975) that there are exceptions to Article III of the Constitution, requiring that a plaintiff have a personal stake in the litigation throughout the entire proceeding. Exceptions include when the harm is continuing in nature, outlasting the named plaintiff. If a claim is so inherently transitory that it could not survive live controversy long enough for one individual to certify a class, but the deprivations continued for a subsequent group of people, a class can still be certified.

Judge Barker noted that Bell was "strongly committed" to this action and had promised to remain in contact with his attorney and make himself available for any depositions or trial. She said he therefore "adequately represented the interests of the class," and certified the suit as a class action on June 25, 2019. The case remains pending. See: *Bell v. Sheriff of Henry County*, U.S.D.C. (S.D. Ind.), Case No. 1:19-cv-00557-SEB-MJD; 2019 U.S. Dist. LEXIS 105856. ◼

Additional source: *city-countyobserver.com*